**PATHFINDER COMMUNICATIONS CORPORATION, Appellant–Plaintiff,**

v.

**Dave MACY, Appellee–Defendant.**

No. 02A04–0303–CV–146.

Court of Appeals of Indiana.

Sept. 17, 2003.

Thomas M. Kimbrough, Michael H. Michmerhuizen, Cathleen M. Shrader, Barrett & McNagny LLP, Fort Wayne, IN, Attorneys for Appellant.

Richard P. Samek, Diana C. Bauer, M. Randall Spencer, Miller Carson Boxberger & Murphy LLP, Fort Wayne, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Pathfinder Communications Corporation ("WOWO") filed a motion for preliminary injunction and a complaint requesting a temporary restraining order, preliminary and permanent injunctions, and damages against its former employee, Dave Macy ("Macy"),[1] in Allen Superior Court alleging that Macy violated a covenant not to compete by obtaining employment at a competing radio station. After a hearing was held on WOWO's motion for preliminary injunction, the trial court found that WOWO did not have a legitimate protectible interest in Macy or his radio program "Macy in the Morning," and that the covenant not to compete was unenforceable because it was overbroad. The trial court therefore denied WOWO's motion for preliminary injunction. WOWO appeals raising three issues, which we restate as:

I. Whether WOWO has a legitimate protectible interest in Macy, its former on-air personality;

II. Whether the covenant not to compete is overbroad; and,

III. Whether the trial court abused its discretion when it denied WOWO's motion for a preliminary injunction.

Concluding that WOWO does have a legitimate protectible interest in Macy,

---

1. Otherwise known as David Deppisch.

that the covenant not to compete is rendered reasonable by "blue penciling" or striking its overbroad language, but that the trial court properly denied WOWO's request for injunctive relief, we affirm in part and reverse in part.

## Facts and Procedural History

Pathfinder Communications owns and operates several AM and FM radio stations in Indiana, including WOWO, a Ft. Wayne AM radio station. In 1998, WOWO hired Macy to be its morning show host from 5:00 a.m. to 9:00 a.m. Prior to his employment with WOWO, Macy had developed the radio program "Macy in the Morning," a talk show featuring telephone calls from the public as well as political and social commentary by Macy. The show was described as being combative and opinionated with a conservative viewpoint. Topics often discussed on the show included abortion, religion, gun control, and gay and lesbian rights. Macy developed that format during his employment at radio stations in Ohio and Tennessee, and WOWO hired Macy specifically for his "Macy in the Morning" show format.

When he was hired by WOWO, Macy signed an employment agreement that contained the following covenant not to compete: [2]

Employee agrees that during the term of Employee's employment and for a period of twelve (12) consecutive calendar months thereafter, Employee will not engage in activities or be employed as an on-air personality, either directly or indirectly, with the following radio stations (which radio stations are in direct competition with and are engaged in radio broadcasting business substantially similar to WOWO): WAJL, WBTU, WEXI, WGL, WGLL–FM, WSHI, WJFX, WLDE, WXKE, WGL, WYSR, WEJE, WFCV, WLZQ.

Ex. Vol., Plaintiff's Ex. 1. The agreement also provided: "the parties expressly agree that the restrictions set forth" in the covenant "are fair and reasonable in all respects." *Id.*

In 2002, WOWO commissioned a consulting study of all of the station's programming, including Macy's show. As a result of that study, WOWO determined that it should modify the format of Macy's show to focus more on "hard news," weather, and local events. WOWO told Macy to tone down the controversial and combative nature of the show, and that Macy needed to approach issues in a less controversial fashion. Tr. pp. 89–90. Macy was also told to avoid discussions of issues such as religion, abortion, and gay and lesbian rights unless they were "newsworthy." Tr. p. 91. Essentially, WOWO decided to "take the program in a different direction" with more emphasis on news and information and less emphasis on controversial programming. Tr. p. 99. The name of Macy's show was also changed to "Fort Wayne Morning News with Dave Macy." After the change in format, the Arbitron ratings for Macy's show rose by three full shares.[3]

Macy's employment with WOWO was terminated in December 2002 after Macy falsified program logs, which is a violation

---

**2.** The agreement contained a second covenant not to compete, but WOWO only alleged that Macy violated the covenant not to compete set forth above.

**3.** Arbitron ratings measure a thirteen-week rating period twice a year to determine market share and demographics of a radio sta-

tion. If a radio station's Arbitron ratings increase, it can command a greater price for advertising and is likely to obtain more advertisers. An increase of one share in the Arbitron ratings typically results in an increase of revenues of approximately $200,000 for WOWO. Tr. p. 59.

of the rules and regulations established by the Federal Communications Commission.[4] Two months later, WGL, a competing radio station in Fort Wayne, hired Macy to host their morning show utilizing the "Macy in the Morning" format. On February 24, 2003, WOWO filed a complaint requesting a temporary restraining order, preliminary and permanent injunctions, and damages against Macy alleging that Macy had breached the covenant not to compete described in his employment agreement. On that same date, WOWO filed a motion requesting a preliminary injunction and/or temporary restraining order.

A hearing was held on the motion on March 3–4, 2003. On March 21, 2003, the trial court issued its findings of fact and conclusions of law. The trial court found:

10. When WOWO discontinued the "Macy in the Morning" talk show and instituted the news/talk program entitled "Fort Wayne's Morning News with Dave Macy," it fundamentally changed the format of the show and the product known as "Macy in the Morning" for which Macy had been hired and for which he became known.

\* \* \*

16. Since "Macy in the Morning" no longer existed after September 2002, and Dave Macy no longer was on the air for WOWO in any capacity after December 16, 2002, nothing remained within which WOWO could claim a property right.

\* \* \*

18. WOWO has no legitimate protectible interest in "Macy in the Morn-

ing" or Dave Macy as it voluntarily chose to eliminate his persona and that style of show from its programming.

\* \* \*

20. Even if the Court were to determine that a legitimate protectible interest existed, the non-compete covenant is still unenforceable as it is overly broad with respect to the activities proscribed.

Appellant's App. pp. 10–12. The trial court therefore denied WOWO's request for a preliminary injunction. WOWO now appeals. Additional facts will be provided as necessary.

**Standard of Review**

▇▇▇▇ The denial "of a preliminary injunction rests within the sound discretion of the trial court, and our review is limited to whether there was a clear abuse of that discretion." *Apple Glen Crossing, LLC v. Trademark Retail, Inc.*, 784 N.E.2d 484, 487 (Ind.2003)

To obtain a preliminary injunction, the moving party has the burden of showing by a preponderance of the evidence that: (1) the movant's remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (2) the movant has at least a reasonable likelihood of success at trial by establishing a prima facie case; (3) threatened injury to the movant outweighs the potential harm to the nonmoving party resulting from the granting of an injunction; and (4) the public interest would not be disserved. If the movant fails to prove any of these re-

---

4. Program logs specify the time at which the on-air personality aired a commercial for advertisement.

quirements, the trial court's grant of an injunction is an abuse of discretion.

*Id.* at 487–88 (citing *Ind. Family & Soc. Servs. Admin. v. Walgreen Co.*, 769 N.E.2d 158, 161 (Ind.2002)). "The power to issue a preliminary injunction should be used sparingly, and such relief should not be granted except in rare instances in which the law and facts are clearly within the moving party's favor." *Barlow v. Sipes*, 744 N.E.2d 1, 5 (Ind.Ct.App.2001), *trans. denied.*

 Further, the trial court is required to issue special findings of fact and conclusions of law when determining whether to grant a preliminary injunction. *Robert's Hair Designers, Inc. v. Pearson*, 780 N.E.2d 858, 863 (Ind.Ct.App.2002); Ind. Trial Rule 52(A). We must therefore determine whether the evidence supports the trial court's findings, and whether the findings support the judgment. *Indianapolis Ind. Aamco Dealers Adver. Pool v. Anderson*, 746 N.E.2d 383, 386 (Ind.Ct.App.2001). We will not disturb the trial court's findings or judgment unless they are clearly erroneous. *Id.* Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them. *Culley v. McFadden Lake Corp.*, 674 N.E.2d 208, 211 (Ind.Ct.App.1996). A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Carroll v. J.J.B. Hilliard et al.*, 738 N.E.2d 1069, 1075 (Ind.Ct.App.2000), *trans. denied.* We will neither reweigh evidence nor judge the credibility of witnesses, but will consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom. *Anderson*, 746 N.E.2d at 386; *Gunderson v. Rondinelli*, 677 N.E.2d 601, 603 (Ind.Ct.App.1997).

## I. Covenant Not to Compete

 Indiana courts have generally recognized and respected the freedom to contract. *Robert's Hair Designers*, 780 N.E.2d at 869. However, covenants not to compete are in restraint of trade and are not favored by the law. *Burk v. Heritage Food Serv. Equip., Inc.*, 737 N.E.2d 803, 811 (Ind.Ct.App.2000). "Noncompetition agreements are strictly construed against the employer and are enforced only if reasonable. Covenants must be reasonable with respect to the legitimate interests of the employer, restrictions on the employee, and the public interest." *Id.* To determine the reasonableness of the covenant, we first consider whether the employer has asserted a legitimate interest that may be protected by a covenant. *Id.* If the employer has asserted such an interest, we then determine whether the scope of the agreement is reasonable in terms of time, geography, and types of activity prohibited. *Id.* "The employer bears the burden of showing that the covenant is reasonable and necessary in light of the circumstances." *Id.* In other words, the employer must demonstrate that " 'the former employee has gained a unique competitive advantage or ability to harm the employer before such employer is entitled to the protection of a noncompetition covenant.' " *Id.* (quoting *Slisz v. Munzenreider Corp.*, 411 N.E.2d 700, 706 (Ind.Ct.App.1980)).

### A. Legitimate Protectible Interest

WOWO argues that the trial court erred when it determined that WOWO did not have a legitimate protectible interest in Macy or "Macy in the Morning." The trial court found that WOWO "voluntarily chose to eliminate [Macy's] persona and that style of show from its programming, [and] such a fundamental change in WOWO's programming negated any claim of loss of goodwill when Macy took the abandoned

'Macy in the Morning' show to another station." Appellant's App. p. 11. WOWO asserts that despite the changes to Macy's show, "WOWO nevertheless has an interest in Dave Macy, *the on-air personality* WOWO cultivated, its listeners and audience (regardless of the content of Macy's radio show), and that interest is legally protectible under Indiana law." Br. of Appellant at 10 (emphasis in original).

To demonstrate a legitimate protectible interest, "an employer must show some reason why it would be unfair to allow the employee to compete with the former employer." *Unger v. FFW Corp.,* 771 N.E.2d 1240, 1244 (Ind.Ct.App.2002) (citation omitted).

> An employer may not simply forbid his employee from subsequently operating a similar business. The employer must have an interest which he is trying to legitimately protect. There must be some reason why it would be unfair to allow the employee to compete with the former employer. The employee should only be enjoined if he has gained some advantage at the employer's expense which would not be available to the general public.

*Norlund v. Faust,* 675 N.E.2d 1142, 1154 (Ind.Ct.App.1997), *clarified on denial of reh'g,* 678 N.E.2d 421 (Ind.Ct.App.1997), *trans. denied.*

Our courts have generally concluded that covenants not to compete are valid when they protect an employer's interest in confidential information and/or the good will generated between a customer and a business. *Duneland Emergency Physician's Med. Group, P.C. v. Brunk,* 723 N.E.2d 963, 966 (Ind.Ct.App.2000), *trans. denied* (citation omitted). *See also Unger,* 771 N.E.2d at 1244 (citation omitted) ("As an incident to its business, an employer is entitled to contract to protect the good will of the business. Goodwill includes secret or confidential information such as the names and address of customers and the advantage acquired through representative contact."). "However, 'an employee signing a restrictive covenant not to compete is entitled to utilize the general skills he has acquired in performing his job, and can only be prevented from doing so under circumstances where their use adverse to his employer would result in irreparable injury.'" *Brunk,* 723 N.E.2d at 966 (quoting *Slisz,* 411 N.E.2d at 704).

We are unable to find any Indiana case addressing similar circumstances to those presented in this appeal. Thus, we turn to case law from other jurisdictions for guidance. In *New River Media Group, Inc. v. Knighton,* 245 Va. 367, 429 S.E.2d 25, 26 (1993), the Virginia Supreme Court found that the covenant not to compete was enforceable because the radio station had demonstrated that it was necessary to protect its legitimate business interests. In doing so, the court relied on the following facts: 1) Knighton, as the radio station's morning announcer, had the highest profile of any of its on-air personalities; 2) The radio station had invested substantial time and money in promoting Knighton; 3) Knighton supervised other radio announcers, was involved in developing promotions and contests, and produced commercials. *Id.*

In *T.K. Communications, Inc. v. Herman, et al.,* 505 So.2d 484 (Fla.Dist.Ct. App.1987), *review denied,* McBean and Herman were featured and promoted by WSHE as the "Morning Team" and they acquired a large listening audience which resulted in considerable advertising revenue. *Id.* at 485. After exercising their right to terminate their employment contract, which contained a covenant not to compete, but before their effective termi-

nation date, McBean and Herman executed a "letter of agreement" with WGTR, a competitor of WSHE. *Id.* Pursuant to that agreement, they accepted the position of hosts of that station's morning show, which they would begin to host after their non-competition period had expired. *Id.* Although they were not on-air during that time period, McBean and Herman spent several hours at WGTR, had discussions with its program director, and provided names of local personalities, including those of WSHE's employees, whom WGTR might contact to hire. *Id.* Also, WGTR used the names and reputations of McBean and Herman to promote its station and to solicit competing advertising accounts before their non-competition period expired. *Id.* Even though they were not on air during the non-competition period, the Florida court determined that McBean and Herman breached the covenant not to compete because they allowed WGTR to make use of their names and reputations which were "significant" and of "unique value;" and therefore of "special value" to WGTR. *Id.* at 486.

In *Cullman Broadcasting Company, Inc. v. Bosley*, 373 So.2d 830 (Ala.1979), Bosley, who was employed by Cullman as a disc jockey, entered into an employment contract, which contained a covenant not to compete. *Id.* at 831. After Bosley's employment was terminated, he obtained employment at another station in the same city; however, that station had a different music format. *Id.* at 832. In considering whether the covenant not to compete was enforceable, the Alabama Supreme Court reviewed similar cases from around the country and found that generally the covenant was not enforced if the employee's abilities were considered "ordinary, if not less than ordinary;" however, where the employee was considered to be a "personality," "a special talent," or a "feature personality," the covenants were enforced.

*Id.* at 835. The court then determined that the covenant was enforceable against Bosley and stated:

We believe that [Cullman] possessed a substantial right in its business sufficiently unique to warrant the type of protection contemplated by this non-competition agreement. The very nature of radio broadcasting is such that often the only personalized contact the broadcaster makes with the listening audience is through its individual announcers. To the casual listener, the only personal means of identifying the broadcaster (and its advertisers) is through the announcer. For better or for worse, the announcer establishes the identity of the broadcaster and conveys the broadcaster's message to the community. Therefore, we do not deem it unconscionable for a broadcaster to seek to restrain a former announcer from identifying a different broadcaster and conveying a different message.

*Id.* at 836.

Conversely, in *Richmond Brothers, Inc. v. Westinghouse Broadcasting Company, Inc.*, 357 Mass. 106, 256 N.E.2d 304 (1970), the Massachusetts Supreme Court held that enforcing the covenant not to compete was not reasonably necessary to protect the radio station's interests. In that case, the on-air personality, Jacoby, was the moderator of a popular talk show on WMEX, a Boston radio station. *Id.* at 305. After Jacoby terminated his employment with WMEX, he obtained employment at a Chicago radio station. *Id.* at 306. Three years later he returned to Boston and obtained employment with a radio station before his noncompetition period had expired. *Id.* WMEX sought an injunction against Jacoby, which the trial court denied. On appeal, despite WMEX's assertion that Jacoby's success upon his return to Boston was the direct product of

its expenditures and promotion of Jacoby during his employment with WMEX, the court affirmed the trial court's denial of injunctive relief and stated:

> Even though a broadcasting company may have expended large sums to promote a performer's popularity with the listening public, it would indeed be difficult to determine that such expenditures and promotion have resulted in the performer's popularity. The performer's popularity may well be attributed to his own personality and ability. Even if we assume that the plaintiff's promotion of Jacoby resulted in his popularity, we believe that Jacoby's absence for almost three years from the Boston broadcasting area sufficiently protected any business interests of the plaintiff. During this period the plaintiff continued to conduct a "talk show" during the time slot previously occupied by Jacoby.

*Id.* at 307.

In *West Group Broadcasting, Ltd. v. Bell*, 942 S.W.2d 934 (Mo.Ct.App.1997), the Missouri Court of Appeals determined that the radio station, KXDG, failed to present any evidence that it had a legitimate protectible interest in Bell, its former on-air personality, and therefore, the court concluded that it would be unreasonable to enforce the covenant not to compete. *Id.* at 937, 939. In that case, while on the air at KXDG, Bell used the name Hurricane Hannah, and she hosted the 7:00 p.m. to midnight time slot with a country music format. Bell eventually left KXDG and obtained employment at KSYN; however, she assumed a new on-air name, worked a different time slot, and was simply a co-host with a male announcer. *Id.* at 938. Despite KXDG's argument that Bell's voice was very recognizable, the court determined that "Bell did nothing at KSYN to capitalize on the image of the radio personality developed for her at KXDG." *Id.* at 939. However, the court did indicate that its result might have been different had Bell attempted to utilize the Hurricane Hannah radio personality. *Id.*[5]

 In this case, we initially observe that WOWO did not develop the format "Macy in the Morning" and it abandoned and ceased to promote that format; therefore, WOWO abandoned any protectible interest it had in that specific format. However, the more significant issue in this case is whether WOWO had a legitimate protectible interest in Dave Macy, its on-air personality.

The evidence presented at the hearing revealed that, in general, the morning drive time slot is the most important day period for a radio station in terms of generating the largest audience and revenue; therefore, "it is not unusual for a radio station to invest most of its resources in that morning drive program." Tr. p. 58.

---

5. In support of his argument that WOWO does not have a legitimate protectible interest, Macy relies on *Bennett v. Storz Broadcasting Company*, 270 Minn. 525, 134 N.W.2d 892 (1965). Macy's reliance on that case is misplaced as it is factually and procedurally distinct from the case before us. *Bennett* involved an appeal from a summary judgment proceeding. *Id.* at 526, 134 N.W.2d at 894. The Minnesota Supreme Court reversed the trial court's summary judgment order and held that the record did not establish as a matter of law that the restrictive covenant was enforceable. *Id.* at 536–37, 134 N.W.2d at 900. In its opinion, the court observed that Bennett, the on-air personality, was considered to be an ordinary, if less than ordinary, radio personality by the radio station as evidenced by the removal of Bennett from a day-time schedule to an all night schedule, which did not carry advertising. *Id.* at 529–30, 134 N.W.2d at 896. Unlike *Bennett*, in this case, by changing the format of Macy's show, WOWO was attempting to obtain more listeners, which would increase its market share and in effect, increase Macy's name recognition and marketability.

WOWO's employment agreement with Macy provided that WOWO would "incur expenditures in training, promoting, and developing the public's recognition and awareness" of Macy. Ex. Vol., Plaintiff's Ex. 1.

After WOWO hired Macy, who was unknown in the Ft. Wayne market, WOWO engaged in a campaign to promote Macy, which included outdoor advertising on billboards, newspaper advertising, and advertising for Macy and his show on WOWO during all station programming. Tr. p. 56. The General Manager of WOWO testified that the station spent "hundreds of thousands of dollars" to promote Macy in the Ft. Wayne market. Tr. p. 57. Further, the General Manager stated that the particular on-air personality affects the station's ability to sell advertising in that personality's time slot. Tr. p. 60. Macy agreed that he now has "very good name recognition" in the Fort Wayne market. Tr. p. 27.

After WOWO commissioned a consulting study for all programming, including Macy's show "Macy in the Morning," WOWO determined that it should modify the format of Macy's show to focus more on "hard news," weather, and local events. WOWO's objective in changing the format of Macy's show was to expand the overall listening audience. Tr. p. 99. Despite that objective and the three point increase in the Arbitron ratings after the format of the show was changed, Macy contends that WOWO "dissipate[d] any goodwill it created" and "undermine[d] Macy's image by changing the essence of his show;" therefore, WOWO abandoned any protectible interest it had in Macy as its on-air personality. Br. of Appellee at 12. We disagree.

Similar to the facts in *Knighton, T.K. Communications,* and *Cullman,* WOWO invested substantial resources in Macy to promote him in the Ft. Wayne market. While on the air at WOWO, Macy acted as WOWO's representative to its listening audience. Also, Macy obtained employment at WGL, a direct competitor of WOWO with a similar format, and he is hosting the morning drive time slot, the same time slot he hosted at WOWO. Although WOWO changed the format of Macy's show, it did so solely in an attempt to expand Macy's listening audience, which did not, as Macy argues, have the effect of dissipating the goodwill it had fostered in him. We therefore hold that WOWO does have a legitimate protectible interest in Macy, its former on-air personality.

### B. *Scope of the Covenant*

We now turn to WOWO's argument that the trial court erred when it determined that the covenant not to compete "is overly broad with respect to the activities proscribed." *See* Appellant's App. p. 12. In determining whether a covenant not to compete is reasonable, we must consider "whether the scope of the agreement is reasonable in terms of time, geography, and types of activity prohibited." *Burk,* 737 N.E.2d at 811. The employer must demonstrate that the covenant is reasonable and necessary in light of the circumstances. *Id.*

In *Burk,* the covenant at issue provided that

"(a) Employee will not . . . do any of the following:

(i) Own, manage, control or participate in the ownership, management or control of, or be employed or engaged by or otherwise affiliated or associated as consultant, independent contractor or otherwise with any corporation, partnership, proprietorship, firm, association or other business entity which competes with, or otherwise engages in any business of the Corporation, as presently

conducted in the States [sic] of Indiana (Territory" [sic] ).

*Id.* at 812 (record citation omitted). On appeal, the employee argued that the covenant was overbroad because it effectively prohibited him from working for a competitor in any capacity. *Id.* at 812. Our court agreed and therefore concluded that the covenant was unenforceable. *Id.*

In *Unger*, the employee relied on *Burk* to argue that the covenant in his contract was unreasonably overbroad. *Unger*, 771 N.E.2d at 1245. The covenant in *Unger* restricted the employee from "participating in a business that is competitive with [his former employer], which provides a variety of financial services." *Id.* We noted that the employee "was therefore free to seek employment with any business that did not provide financial services," and concluded that "the noncompetition clause was reasonably limited in the type of activity that it prohibited." *Id.*

 In this case, the covenant provides in pertinent part: "[e]mployee *will not engage in activities* or be employed as an on-air personality, either directly or indirectly" at certain radio stations in the Fort Wayne market. Ex. Vol., Plaintiff's Ex. 1 (emphasis added). WOWO argues that the covenant is similar to the covenant in *Unger* and distinguishable from the covenant in *Burk* because it does not "extend to the entire State of Indiana; nor does it prohibit Macy from working for any competitor of WOWO." Br. of Appellant at 19. Conversely, Macy contends that like the covenant in *Burk*, in this case, the covenant prevents Macy from seeking employment with a competing radio station in any capacity including "producing, owning, directing, cleaning or acting as a security guard for" any one of those stations. Br. of Appellee at 24.

Because noncompetition agreements are to be strictly construed against the em-

ployer, *see Burk*, 737 N.E.2d at 811, we agree with Macy that the language "will not engage in activities" would prevent Macy from being employed in any capacity by any radio station listed in the covenant. This prohibition extends far beyond WOWO's legitimate interests in Macy, as an on-air personality, which we have discussed above. That portion of the covenant is overbroad and therefore unreasonable.

 WOWO also contends that even if the covenant is overbroad, "the contract is clearly divisible into parts and enforceable to protect WOWO's legitimate interests." Br. of Appellant at 21.

 When a court determines that portions of a covenant are unreasonable, it

> "may not create a reasonable restriction under the guise of interpretation, since this would subject the parties to an agreement they have not made." However, if a covenant is clearly divisible into parts, and some parts are reasonable while others are unreasonable, a court may enforce the reasonable portions only.

*Burk*, 737 N.E.2d at 811 (citations omitted). Utilizing that process, which is known as "blue-penciling," the court strikes the unreasonable provisions from the covenant. *Id.* However, the court is prohibited from adding terms that were not originally part of the agreement. *Id.* "Rather, 'unreasonable restraints are rendered reasonable by scratching out any offensive clauses to give effect to the parties' intentions.'" *Id.* (quoting *Smart Corp. v. Grider*, 650 N.E.2d 80, 84 (Ind.Ct. App.1995), *trans. denied*).

We agree with WOWO that the overbroad language "engage in activities or" is divisible and can be deleted from the covenant. Without adding any additional

terms, the remaining provisions are then rendered reasonable. The result, which reads:

"Employee agrees that during the term of Employee's employment and for a period of twelve (12) consecutive calendar months thereafter, Employee will not be employed as an on-air personality, either directly or indirectly, with the following radio stations (which radio stations are in direct competition with and are engaged in radio broadcasting business substantially similar to WOWO): WAJL, WBTU, WEXI, WGL, WGLL–FM, WSHI, WJFX, WLDE, WXKE, WGL, WYSR, WEJE, WFCV, WLZQ"

is a reasonable restriction sufficient to protect WOWO's legitimate interests.

## II. Preliminary Injunction

Finally, WOWO argues that the trial court abused its discretion when it failed to grant preliminary injunctive relief to WOWO. To obtain a preliminary injunction, WOWO had to prove each of the following:

1) [WOWO's] remedies at law were inadequate, thus causing irreparable harm pending resolution of the substantive action;

2) [WOWO] had at least a reasonable likelihood of success at trial by establishing a prima facie case;

3) [WOWO's] threatened injury outweighed the potential harm to [Macy] resulting from the granting of an injunction; and

4) the public interest would not be disserved.

*Robert's Hair Designers,* 780 N.E.2d at 863–64. WOWO argues that it has demonstrated that it will suffer irreparable harm if Macy is allowed to remain on the air at its competitor, WGL, and that its remedies at law are inadequate.

In *Robert's Hair Designers,* we observed:

Our supreme court recently noted that if an adequate remedy at law exists, injunctive relief should not be granted. The trial court "has a duty to determine whether the legal remedy is as full and adequate as the equitable remedy." "A legal remedy is adequate only where it is as plain and complete and adequate— or, in other words, as practical and efficient to the ends of justice and its prompt administration—as the remedy in equity." A party suffering "mere economic injury is not entitled to injunctive relief because damages are sufficient to make the party whole."

*Id.* at 864 (internal citations omitted); *see also Fumo v. Med. Group of Michigan City, Inc.,* 590 N.E.2d 1103, 1108 (Ind.Ct. App.1992), *trans. denied* (A preliminary injunction "may be issued, upon balancing the consequent hardships, only where an irreparable injury cannot be redressed by a final judgment on the merits.").

In *Robert's Hair Designers,* two hairstylists employed by Robert's Salon signed an agreement, which contained a covenant not to compete. 780 N.E.2d at 862. The hairstylists later terminated their employment with Robert's and began working at a nearby salon in violation of that covenant. *Id.* at 863. The hairstylists told the customers they served at Robert's that they would be terminating their employment at Robert's, and that they would be working at the competing salon. *Id.* at 864–65. Robert's sought a preliminary injunction against the hairstylists, and at the hearing, Robert's owner testified that although he could not name the customers lost as a result of the hairstylists' departure, that the hairstylists had served thirty-five to forty customers per week and that the salon no longer received phone calls regarding the hairstylists. *Id.* at 864.

The trial court denied Robert's request for injunctive relief finding that Robert's was unable to demonstrate irreparable harm or any economic loss or loss of goodwill, and noted that Robert's overall business revenues increased in the one-week period after the hairstylists terminated their employment. *Id.*

On appeal, we observed that the record clearly established that Robert's Salon lost customers as a direct result of the hairstylists' actions and that had the hairstylists "not left the employment of Robert's Salon and not taken the customers that they served, Robert's Salon's increase in revenues would have been even greater." *Id.* at 865. Therefore, Robert's did demonstrate an economic loss as a result of the hairstylists' departure and further, the fact that Robert's could not quantify the loss was irrelevant. *Id.* "[E]ven if Robert's Salon could have quantified its losses up to the date of the preliminary injunction hearing, losses to Robert's Salon's good will as a result of [the hairstylists'] current and future violations of the agreement would warrant a finding of irreparable harm." *Id.* Our court then determined that the trial court abused its discretion when denied Robert's request for a preliminary injunction. *Id.* at 870.

In *Indiana Family and Social Services Administration v. Walgreen Co.,* 769 N.E.2d 158 (Ind.2002), Walgreens sought and obtained an injunction to prevent the State from implementing certain emergency cost-containment measures designed to decrease the Medicaid reimbursement rates to pharmacies for drugs they dispensed and pay the pharmacies less for dispensing drugs. *Id.* at 160–61. The testimony presented at the preliminary injunction hearing revealed that in addition to economic losses, some of the pharmacies might have to close and Medicaid recipients could be harmed. *Id.* at 163. On appeal, our supreme court noted that a party suffering mere economic injury is not entitled to injunctive relief and that "imminent business loss or failure is a form of economic injury." *Id.* at 162 n. 4. The court then observed that given the evidence presented that alternative sources of pharmacy services were available and that State would work to ensure the beneficiaries had sufficient access to services, "Walgreens failed to identify any injury beyond purely economic injury, which is not enough to justify injunctive relief." *Id.* at 163. The court concluded that Walgreens had an adequate remedy at law because "post-trial damages would adequately compensate for any injuries should Walgreens prevail at trial." *Id.*

In this case, the evidence presented at the preliminary injunction hearing revealed that Macy's employment with WOWO was terminated in December 2002 and WOWO replaced him with Charley Butcher, renaming the show "Ft. Wayne Morning News with Charley Butcher." Charley Butcher also has name recognition in the Ft. Wayne market. Tr. p. 105. The General Manager of WOWO testified that two of the station's advertisers began to advertise on WGL after Macy became its on-air personality. Tr. p. 92. However, he also admitted that one of those advertisers, Auto Collision, still advertises on WOWO and is still considered a client. Tr. p. 94. He stated that it is common in the radio industry for an advertiser to carry advertisements on more than one radio station. Tr. p. 94. There was no evidence presented concerning the date on which the other advertiser, Legacy Heating and Air, stopped advertising on WOWO. Further, the General Manager stated that there were probably some advertisers that renewed their contracts with WOWO after Macy was fired. Tr. p. 105. Specifically, he testified, "I maintain that

we've kept advertisers after [Macy] left. We kept advertisers because they bought into the format and also because Charley Butcher had some recognition . . . as well." Tr. p. 105. Although evidence was also presented that some former WOWO listeners are now listening to Macy on WGL, the record before us does not indicate whether a substantial number of listeners are now listening to Macy on WGL. Tr. pp. 24, 66. Finally, Macy had been on the air at WGL for approximately one week on the date of the hearing. Tr. p. 66.

■ WOWO has failed to demonstrate that they have lost even one advertiser as a result of Macy's employment with WGL. Although evidence was presented that Legacy Heating and Air is no longer advertising on WOWO and is now advertising on WGL, from the record before us, there is no evidence concerning the date on which Legacy Heating and Air ceased advertising on WOWO. Unlike the facts in *Robert's Hair Designers,* there is no evidence that Macy has contacted advertisers in an attempt to lure them to WGL. Also, in *Robert's Hair Designers',* the two hairstylists started competing with Robert's immediately before Robert's Salon could hire replacements; however, in this case, WOWO replaced Macy with an on-air personality with name recognition in the Ft. Wayne market before Macy went on the air at WGL. Further, WOWO admitted that it could only speculate that it will lose advertisers to WGL. Finally, if WOWO does lose advertising contracts as a result of Macy's violation of the covenant not to compete, post-trial damages would adequately compensate for such economic loss should WOWO prevail at trial. *See Walgreen,* 769 N.E.2d at 163.

### Conclusion

The trial court erred when it determined that WOWO did not have a legitimate protectible interest in Macy, its on-air personality, and when it determined that the covenant not to compete was not overbroad. However, the unreasonable language of the covenant can be stricken rendering the remaining portions of the covenant reasonable. Despite these errors however, the trial court did not abuse its discretion when it denied WOWO's request for a preliminary injunction because WOWO was required to prove that its remedies at law are inadequate, which it failed to do.

Affirmed in part and reversed in part.

MAY, J., concurs.

KIRSCH, J., concurs in part and dissents in part with opinion.

KIRSCH, Judge, concurring in part and dissenting in part.

I fully concur in the majority decision holding that WOWO has a legitimate protectible interest and that the covenant not to compete can be rendered reasonable by striking the overbroad language. However, I do not think that WOWO has an adequate remedy at law, and therefore, a preliminary injunction should issue to protect WOWO's interest. Accordingly, I respectfully dissent from the majority decision affirming the denial of the preliminary injunction.