Craig P. **COFFMAN** and **Coffman Proactive CPA Services, LLC,** Appellants–Defendants/Cross–Appellees,

v.

**OLSON & COMPANY, P.C.,** Appellee–Plaintiff/Cross–Appellant.

No. 53A04–0804–CV–190.

Court of Appeals of Indiana.

May 18, 2009.

Rehearing Denied July 10, 2009.

Richard W. Lorenz, Hickam & Lorenz, P.C., Spencer, IN, Attorney for Appellants.

Michael L. Carmin, Andrews, Harrell, Mann, Carmin & Parker, P.C., Bloomington, IN, Attorney for Appellee.

## OPINION

KIRSCH, Judge.

Craig P. Coffman and Coffman Proactive CPA Services, LLC (collectively, "Appellants"), appeal the trial court's judgment in favor of Coffman's former employer, Olson & Company, P.C. ("Olson"), on Olson's claim for breach of a confidential non-disclosure and client proprietary agreement ("the Agreement"). Both sides appeal the trial court's damages award. The issues presented in this appeal are as follows:

 I. Whether Olson had a protectable interest that could be enforced by the noncompetition provision of the Agreement; and

 II. Whether the trial court erred by voiding the liquidated damages

provision in the Agreement and calculating the damages award.

We affirm.

## FACTS AND PROCEDURAL HISTORY

The relevant facts are undisputed. Coffman is a certified public accountant whom Olson employed in 1996. Each year, Olson requires its employees to sign the Agreement. The version of the Agreement that Coffman signed in 2005 reads in pertinent part as follows:

4. In the event of the termination of employment between the undersigned and Olson & Co., the undersigned will not directly or indirectly compete for the clients of Olson & Co. for a period of two years in the geographical area of Lawrence County and Monroe County, Indiana, as an employee, agent, independent contractor, partner, shareholder, or principal of, any other Certified Public Accounting firm whether operated as a corporation, partnership, proprietorship, or association; within the boundaries of the territory prescribed by this Agreement. This agreement does not restrict or prohibit the undersigned from becoming an employee of another Certified Public Accounting firm, or from establishing his or her own accounting practice for the purpose of servicing clients that are not Olson & Co. clients at the time of termination or have not been Olson & Co. clients for a period of more than 24 months preceding the termination date. This agreement does not restrict the undersigned from obtaining clients, other than Olson & Co. clients for the purpose of providing accounting services as those terms are generally understood.

This agreement does not restrict the undersigned from servicing former Olson & Co. clients who have not been Olson & Co. clients for a period of more than 24 months. It is further understood and agreed that any clients that might have been brought to the firm through the efforts of the undersigned are firm clients and are subject to this restriction.

. . . .

6. The undersigned shall not, either for himself or herself or for any other person, firm or corporation divert or take away or attempt to divert or take away, and during the stated period following termination, call upon or solicit or attempt to call upon or solicit any of the customers or clients of Olson & Co., including, but not limited to, those upon whom he or she has called, or whom he or she solicited, or to whom catered, or with whom he or she became acquainted while employed by Olson & Co.

7. The undersigned agrees that in the event the undersigned or any person, firm or corporation with whom the undersigned is associated, performs accounting services for any Olson & Co. client during the two-year period following the undersigned's termination of employment with Olson & Co., then the undersigned shall pay Olson & Co. an equal amount to two (2) times that client's most recent twelve months billings with Olson & Co. The undersigned further agrees to notify Olson & Co. in writing within thirty (30) days of commencing work for any such client and to pay the sum due hereunder within ten (10) days of such notification. If the undersigned fails to notify or pay Olson &

Co. as provided hereunder, the amount due Olson & Co. shall be equal to three (3) times that client's most recent twelve months billing with Olson & Co.

*Appellants' App.* at 20–22.

Coffman first signed the Agreement in 1996 and did so annually through 2005. In 2006, Coffman refused to sign the Agreement because he was unhappy with changes to Olson's personnel and compensation policies. In anticipation of leaving his employment, Coffman formed Coffman Proactive CPA Services, LLC. Ultimately, Olson and Coffman agreed that Coffman would terminate his employment effective September 1, 2006.

Thereafter, Coffman performed accounting services for seventeen Olson clients, each of whom contacted Coffman after learning that he had left Olson. Coffman advised the clients that he could not solicit their business. The clients terminated their relationship with Olson and hired Coffman. Coffman did not notify or compensate Olson.

On November 13, 2006, Olson filed suit against Appellants. A bench trial was held on October 5, 2007. The trial court permitted the parties to file post-trial briefs.[1] On January 22, 2008, the trial court issued a judgment containing findings of fact and the following relevant conclusions thereon:

> Olson alleges that Coffman breached the Agreement by (1) accepting employment from Olson clients within 24 months of his termination of employment, and failing to pay the amounts set forth in Paragraph # 7 of the Agreement; (2) diverting or taking away or soliciting Olson clients. Olson also alleges that Coffman Proactive Services,

LLC has tortiously interfered with the contract between Olson and Coffman.

Coffman asserts that the Agreement is invalid because (A) there was no consideration for the Agreement; (B) the Agreement constitutes an unreasonable restraint of trade; (C) the terms of the Agreement are overly broad. Coffman also asserts that the damages specified in the Agreement constitute a penalty and are therefore unenforceable.

. . . .

*Reasonableness of the Agreement*

Coffman argues that the Agreement constitutes an unreasonable restraint of trade and that the terms of the Agreement are overly broad. These arguments are closely related. Both attack the reasonableness of the noncompetition clause in light of the employer's interests to be protected, and in light of the effect on Coffman and the public.

. . . .

An employer is entitled to contract to protect the good will of the business. Elements of this good will include secret or confidential information such as the names, addresses and requirements of customers and the advantage acquired through representative contact. These are property rights that an employer is entitled to protect. In considering what is reasonable, regard must be paid to: (a) the question whether the promise is wider than is necessary for the protection of the covenantee in some legitimate interest; (b) the effect of the promise upon the covenantor; and (c) the effect upon the public.

The evidence demonstrates that Coffman knew the names, addresses, and requirements of Olson's clients and that he had acquired an advantage through representative contact with these clients.

---

1. Neither the pleadings nor the briefs appear in the record before us.

Clearly, Olson has established a legitimate interest that may be protected by a covenant not to compete.

. . . .

### Liquidated Damages

More problematic is the liquidated damages provision contained in the Agreement. . . .

. . . .

Pursuant to the terms of the Agreement, if Coffman performs any accounting services for a former client, no matter how minor, the liquidated damages provision is triggered. Coffman is then required to pay a minimum of two times that client's most recent 12–month billings to Olson. If he fails to give notice within 10 days of rendering the service, he must pay three times this amount. This liquidated damage clause is clearly intended to act as a penalty and is therefore unenforceable.

However, this does not mean that Olson is not entitled to recover the damages that reasonably flow from Coffman's breach. . . .

Neither party has introduced evidence as to the amount of fees received by Coffman from Olson's former clients up to the date of the hearing. Therefore, the Court must make this determination based on the available evidence. That evidence demonstrates that, in the 12 months prior to Coffman's termination, Olson received fees totaled $79,263 from the clients in question. The Court finds that this is a reasonable measure of the damages sustained by Olson for the 13 month period following Coffman's breach.

### Nonsolicitation

Paragraph 6 of the Agreement prohibits Coffman from diverting, "taking away," or soliciting Olson clients. Each of Olson's former clients testified that, after learning that Coffman had left Olson's employ, they made an independent decision to discontinue their use of Olson's services and to utilize Coffman['s] services. The evidence does not support a finding that Coffman attempted to solicit his former Olson clients.

### ORDER

It is therefore Ordered, Adjudged and Decreed that judgment is entered for the Plaintiff and against the Defendants in the sum of $79,263 and court costs. *Id.* at 11–16 (citations omitted).[2]

### DISCUSSION AND DECISION

#### Standard of Review

■■■ Here, the trial court *sua sponte* issued findings of fact and conclusions thereon in support of its order. In that situation, the specific findings control only as to the issues they cover, while a general judgment standard applies to any issue upon which the court has made no findings. *See Dewbrew v. Dewbrew,* 849 N.E.2d 636, 640 (Ind.Ct.App.2006). In reviewing the judgment, this court must determine whether the evidence supports the findings and whether the findings, in turn, support the conclusion and judgment. *Id.* We will reverse a judgment only when it is shown to be clearly erroneous, i.e., when the judgment is unsupported by the findings of fact and the conclusions entered on the findings. *Id.* In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the

---

**2.** The trial court's judgment does not address Olson's tortious interference claim. Neither party challenges this omission.

evidence must leave it with the firm conviction that a mistake has been made. *Id.* In determining the validity of the findings or judgment, we consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom, and we will not reweigh the evidence or assess the credibility of witnesses. *Id.* In the case of a general judgment, a general judgment may be affirmed on any theory supported by the evidence presented at trial. *Id.*

## I. Enforceability of the Noncompetition Provision of the Agreement

 First, Coffman argues that the trial court erred by finding that Olson had an enforceable contract. More specifically, Coffman contends that the trial court erred in concluding that Olson had a protectable interest under the Agreement. In *Pathfinder Communications Corp. v. Macy*, 795 N.E.2d 1103 (Ind.Ct.App.2003), we explained,

Indiana courts have generally recognized and respected the freedom to contract. However, covenants not to compete are in restraint of trade and are not favored by the law. Noncompetition agreements are strictly construed against the employer and are enforced only if reasonable. Covenants must be reasonable with respect to the legitimate interests of the employer, restrictions on the employee, and the public interest. To determine the reasonableness of the covenant, we first consider whether the employer has asserted a legitimate interest that may be protected by a covenant. If the employer has asserted such an interest, we then determine whether the scope of the agreement is reasonable in terms of time, geography, and types of activity prohibited. The employer bears the burden of showing that the covenant is reasonable and necessary in light of the circumstances. In other

words, the employer must demonstrate that the former employee has gained a unique competitive advantage or ability to harm the employer before such employer is entitled to the protection of a noncompetition covenant.

795 N.E.2d 1103, 1109 (Ind.Ct.App.2003) (citations and quotation marks omitted). "The ultimate determination of whether a noncompetition covenant is reasonable is a question of law." *MacGill v. Reid,* 850 N.E.2d 926, 929 (Ind.Ct.App.2006). "Appellate courts review questions of law under a de novo standard and owe no deference to a trial court's legal conclusions." *Liberty Mut. Ins. Co. v. Beatty,* 870 N.E.2d 546, 549 (Ind.Ct.App.2007).

 Coffman argues that Olson has not demonstrated a protectable interest because the former clients for whom he performed work had already discharged Olson and testified that they did not intend to return to Olson under any circumstances and that some had hired other accountants before hiring Coffman. Coffman, however, ignores the competitive advantage that he gained while employed by Olson. Indiana law recognizes a protectable interest in the goodwill generated between a customer and a business. *Id.* One element of goodwill is the advantage acquired through representative contact. *Id.* Here, the trial court concluded that Coffman "had acquired an advantage through representative contact with [Olson's] clients. Clearly, Olson has established a legitimate interest that may be protected by a covenant not to compete." *Appellants' App.* at 14. We agree.

The evidence at trial established that Olson structured its business to promote a one-on-one relationship between Olson's accountants and the clients in order to build goodwill, trust, and loyalty between the accountant and the client. The Agree-

ment was drafted in such a way to protect Olson's goodwill, business reputation, and client contacts against potential vulnerability in the event an accountant would leave employment with Olson. That vulnerability is evident in some of the client testimony. Brad Mobley, an Olson client, testified that the meeting with Rick Olson, Coffman, and another Olson employee, during which Mobley was notified that Coffman would no longer be employed by Olson, was the first time he had met Rick Olson. *Id.* at 81. Dmitri Vietze, an Olson client, testified that he chose to leave Olson after learning about Coffman's departure from Olson, and that he had no contact with Rick Olson, aside from a notice that Coffman was leaving. *Id.* at 106. The evidence shows that Olson provides the client contacts to the accountants who then work to establish the trust and loyalty that will lead to continued business.

Coffman asserts that the Agreement is unreasonable as applied to his situation because the clients had already terminated their relationship with Olson. He argues that the noncompetition provision restricted his ability to freely contract with Olson's former clients. He claims that he was not competing with Olson because the clients had already left Olson and sought Coffman's services. However, those clients knew about Coffman from the business relationship Coffman cultivated while in Olson's employ. It is because of the prior working relationship that the clients sought out Coffman's services. Given the specific circumstances of this case, the noncompetition provision was not unreasonable.

Coffman also attacks the Agreement as void as a matter of public policy. Coffman likens accounting services to legal services in that they both involve a relationship with a client in which the professional learns the peculiarities of each client's needs. Coffman notes that attorneys are prohibited from noncompetition agreements by Indiana Rule of Professional Conduct 5.6. Indeed, the commentary to Rule 5.6 explains that an agreement restricting the right of lawyers to practice after terminating employment limits the lawyer's autonomy and limits the freedom of clients to choose a lawyer. Ind. Professional Conduct Rule 5.6 cmt. 1. However, there is no such ethical rule restricting employees and employers in the accounting profession from entering into noncompetition agreements.

In *Ebbeskotte v. Tyler,* 127 Ind.App. 433, 441, 142 N.E.2d 905, 909 (Ind.Ct.App. 1957), the noncompetition provision entered into between an accountant and her employer was upheld as reasonable, not against public policy, and enforceable even though it did not specifically provide for a geographical limitation, or a time limitation. In the present case, the Agreement contains both a geographical limitation, Lawrence County and Monroe County, and a two-year time limitation on the restraint of trade. The noncompetition provision here is not against public policy.

## II. Liquidated Damages

Both parties challenge the trial court's damages award. Coffman does not challenge the trial court's determination that the liquidated damages clause in the Agreement is unenforceable because of its punitive character. However, Coffman challenges the trial court's calculation of damages based upon the evidence of gross revenue, as opposed to lost profit. In the alternative, Coffman argues that even if the liquidated damages clause is enforceable, Olson failed to establish injury caused by Coffman's breach. Olson, on cross-appeal, argues that the trial court erred by finding that the liquidated damages clause of the Agreement was unenforceable because of its punitive character.

In the alternative, Olson argues that if the liquidated damages clause is unenforceable, then the trial court correctly calculated the damages award.

We addressed liquidated damages in *Gershin v. Demming*, 685 N.E.2d 1125, 1127–28 (Ind.Ct.Ap.1997):

> A typical liquidated damages provision provides for the forfeiture of a stated sum of money upon breach without proof of damages. Liquidated damages provisions are generally enforceable where the nature of the agreement is such that when a breach occurs the resulting damages would be uncertain and difficult to ascertain. However, the stipulated sum will not be allowed as liquidated damages unless it may fairly be allowed as compensation for the breach. We are tolerant of provisions within contracts which provide for liquidated damages. Where the sum stipulated in the agreement is not greatly disproportionate to the loss likely to occur, the provision will be accepted as a liquidated damages clause and not as a penalty, but where the sum sought to be fixed as liquidated damages is grossly disproportionate to the loss which may result from the breach, the courts will treat the sum as a penalty rather than as liquidated damages. In determining whether a stipulated sum payable on a breach of contract constitutes liquidated damages or a penalty, the facts, the intention of the parties and the reasonableness of the stipulation under the circumstances of the case are all to be considered. The distinction between a penalty provision and one for liquidated damages is that a penalty is imposed to secure performance of the contract and liquidated damages are to be paid in lieu of performance. Notwithstanding a plethora of abstract tests and criteria for the determination of whether a provision is one for a penalty or liquidated damages, there are no hard and fast guidelines to follow. The question whether a liquidated damages clause is valid, or whether it constitutes a penalty, is a pure question of law for the court.

Our review of the trial court's conclusion that the liquidated damages clause was unenforceable is *de novo*. *See Patel v. United Inns, Inc.*, 887 N.E.2d 139, 150 (Ind.Ct.App.2008).

Olson argues that the only evidence on the issue of reasonableness of the liquidated damages clause was offered by Robert Ralston, a witness for Olson. Ralston testified that a formal business valuation of an accounting practice would include capitalizing net income, but a reasonable approximation of value could be obtained by multiplying annual gross revenue by a factor of two or three. *Tr.* at 68–72. Olson argues that comparing a lost client to a "sale" is an accepted methodology in the accounting field to estimate the damages from the loss of that client. *Appellee's Br.* at 15. Olson points to cases from other jurisdictions where this valuation has been accepted.

However, this court has held differently in *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208 (Ind.Ct.App.1982) and in *Hahn v. Drees, Perugini & Co.*, 581 N.E.2d 457 (Ind.Ct.App.1991). In *Seach*, the liquidated damages clause of the contract between an accountant and an accounting firm called for payment by the former employee of three times the former employer's gross annual billing to clients contacted, advised, visited, or in any way solicited by the former employee. 439 N.E.2d at 215. We held that the liquidated damages clause created a penalty, and was therefore void and unenforceable, because the proscribed acts ranged from contacting to actually advising the former employer's clients. *Id.* at 216. We cited to *Jeffries v.*

*Lesh,* 195 Ind. 503, 144 N.E. 881, 882 (Ind.1924), for the proposition that where a contract contains several conditions of varying degrees of importance, the damages for the breach of some of the conditions would be certain and others uncertain, the large sum agreed to as payable on the breach of any of the conditions should be regarded as a penalty.

In *Hahn,* the liquidated damages clause provided for the former employee to pay the former employer three times the fees received as a result of breaching the non-competition provision. 581 N.E.2d at 463. We held that the liquidated damages clause was a "shotgun clause" or a penalty clause because it assessed treble damages for any contact with "present" clients regardless of whether the contact was harmful to the former employer. *Id.*

We find that the trial court correctly found the liquidated damages clause in the present case to be a penalty and, therefore, unenforceable. Coffman was to pay twice the prior year's gross billings for each client in the event he notified Olson of his breach, and three times the prior year's gross billings for each client in the event Coffman failed to notify Olson. The proscribed conduct was the performance of any accounting service. The trial court correctly followed *Seach* and *Hahn* in the present case.

Coffman next argues that the trial court incorrectly calculated the damages. He claims: 1) that Olson failed to establish any injury flowing from Coffman's representation of Olson clients; and 2) that the trial court erred by using the evidence of gross revenue instead of lost profits in arriving at the damages amount. Olson argues that if the liquidated damages clause is unenforceable, then the trial court correctly estimated Olson's damages.

We reject Coffman's argument that Olson suffered no injury from Coffman's breach because the seventeen clients had chosen not to do business with Olson after Coffman's departure. Olson was injured by Coffman's breach when Coffman used Olson's goodwill and client contacts to perform work for those clients at a competing business. Both the income and the valuation of Olson's business were affected by Coffman's actions.

In the absence of an enforceable liquidated damages clause, lost profits are an appropriate measure of damages in actions involving noncompetition provisions. *See Turbines, Inc. v. Thompson,* 684 N.E.2d 254, 257 (Ind.Ct.App.1997); *Hahn,* 581 N.E.2d at 463. Here, the trial court awarded Olson $79,263 i.e., the gross revenue from the Olson clients for the year preceding Coffman's termination from employment with Olson. In awarding lost profits, net profits, and not gross profits, are generally the proper measure of recovery. *Turbines,* 684 N.E.2d at 257.

Our scope of review when considering a damage award in a breach of contract case is limited. *Whitaker v. Brunner,* 814 N.E.2d 288, 296 (Ind.Ct.App. 2004). We do not reweigh evidence or judge witness credibility, and will consider only the evidence favorable to the award. *Id.* The damage award cannot be based on speculation, conjecture, or surmise, and must be supported by probative evidence. *Id.* When injured by a breach of contract, a party's recovery is limited to the loss actually suffered. *Id.* Such party may not be placed in a better position than he or she would have enjoyed if the breach had not occurred. *Id.* Accordingly, a damage award must reference some fairly defined standard, such as cost of repair, market value, established experience, rental value, loss of use, loss of profits, or direct inference from known circumstances. *Id.* We will reverse the trial court's award only

when it is not within the scope of the evidence of record. *Id.*

Had Coffman and the seventeen clients remained with Olson, Olson would have received the revenue from those clients and paid Coffman a salary for his work. The trial court found that a proper damages award for the breach of the Agreement was the gross revenue from the seventeen clients for the one-year time period immediately preceding Coffman's termination of employment with Olson. In a way, the trial court took into consideration the fact that gross revenue is not equivalent to lost profits, and by limiting the recovery to one year's worth of gross revenue, Coffman's salary could be accounted for, making the damages award more closely resemble lost profits. Olson's expert witness testified that a reasonable approximation of value could be obtained by multiplying annual gross revenue by a factor of two or three. Here, reflecting the potential loss of such clients in any event, the trial court simply used gross revenue without a multiplying factor. The trial court's award is within the scope of the evidence and is a reasonable determination of the damages award.

Affirmed.

VAIDIK, J., concurs.

CRONE, J., dissents with separate opinion.

CRONE, Judge, dissenting.

The majority correctly observes that "Indiana law recognizes a protectable interest in the goodwill generated between a customer and a business" and that "[o]ne element of goodwill is the advantage acquired through representative contact." Slip op. at 8 (citing *Liberty Mut. Ins. Co.,*

870 N.E.2d at 549). The majority agrees with the trial court's conclusion that Coffman " 'had acquired an advantage through representative contact with [Olson's] clients. Clearly, Olson has established a legitimate interest that may be protected by a covenant not to compete.' " *Id.* (quoting Appellants' App. at 14). I respectfully disagree with my colleagues on this crucial point.

Here, the former clients of Olson who appeared at trial testified without exception that they sought Coffman's services only after they had discharged Olson and that they did not intend to return to Olson under any circumstances. Indeed, some clients testified that they hired other accountants before they returned to Coffman. In my view, once the clients voluntarily ceased doing business with Olson, any goodwill that Olson enjoyed with respect to those clients ceased to exist. As such, any protectable interest that Olson had with respect to those clients also ceased to exist.

It is important to distinguish this case from one in which an employee leaves his employer and breaches a covenant not to compete by soliciting or inducing the employer's current clients to patronize his business. In that case, the employer's goodwill with respect to its clients—that is, the interest protected by the covenant— was still in existence at the time the employee breached the covenant. Here, by the time Coffman breached the Agreement by performing accounting services for Olson's *former* clients *at their request* without notifying and compensating Olson, Olson's protectable interest had ceased to exist.[3] Absent a legitimate protectable interest, the Agreement is unenforceable as

---

3. Olson might well have had a legitimate protectable interest in its current clients when Coffman terminated his employment, but, as stated above, that interest ceased to exist when the clients voluntarily ceased doing business with Olson.

an unreasonable restraint of trade. *Pathfinder Commc'ns Corp.*, 795 N.E.2d at 1109.

Reasonableness aside, I further observe that absent a legitimate protectable interest, Olson cannot prove that it was actually damaged by Coffman's breach of the Agreement. As Coffman rhetorically asks, what "revenue or continued client relationship could reasonably be expected by Olson after the clients had terminated its services?" Appellants' Br. at 17 (quotation marks omitted). Absent actual damages, there can be no claim for breach of the Agreement. *See Holloway v. Bob Evans Farms, Inc.*, 695 N.E.2d 991, 995 (Ind.Ct. App.1998) ("[T]he essential elements of any breach of contract claim are the existence of a contract, the defendant's breach thereof, and damages."). Moreover, absent actual damages, there is no basis for awarding liquidated damages, to which Olson claims it is entitled in its cross-appeal. Based on the foregoing, I would reverse and remand with instructions to enter judgment in favor of Appellants. Therefore, I respectfully dissent.