**Richard Linden "Lindy" UNGER, Appellant–Defendant,**

v.

**FFW CORPORATION, Firstfed Financial of Wabash, Inc., a/k/a Firstfed Financial Services of Wabash, Inc. and a/k/a Firstfed Financial, Inc.; and First Federal Savings Bank of Wabash, Appellee–Plaintiff.**

No. 85A02–0201–CV–87.

Court of Appeals of Indiana.

July 26, 2002.

Cynthia Rockwell, Melanie L. Farr, Haller & Colvin, P.C., Fort Wayne, IN, Attorneys for Appellant.

Joel K. Stein, Tiede Metz Downs Lynn & Schlitt, P.C., Wabash, IN, Attorney for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Richard Unger appeals the trial court's order issuing a preliminary injunction in favor of FFW Corporation ("FFW Corp"), FirstFed Financial of Wabash, Inc. ("FirstFed"), and First Federal Savings Bank of Wabash ("the bank"). We affirm.

### Issue

Unger raises one issue, which we restate as the following two:[1]

I.   whether FFW Corp established a reasonable likelihood of success at trial; and

II.  whether FFW Corp established that adequate remedies were not available at law.

### Facts

FFW Corp is a holding company that owns FirstFed and the bank. The bank offers deposits and loans and FirstFed offers non-retail deposits, such as annuities and brokerage services. In March 1992, Unger entered into an employment contract with FirstFed, which contained the following noncompetition clause:

> *Competitive Activity.* During the term hereof and for a period of one (1) year after termination of the employment, Employee shall not, in Wabash County, Indiana, or any county adjacent thereto, either on his own behalf or as an employee, agent or representative of another party, person or corporation, be engaged or actively interested directly or indirectly in any business competitive with the business of Employer (as defined below) and he will not directly own, manage, operate, gain control of, finance or otherwise participate in the ownership, management, operation or control of or be employed by or connected in any manner with any business which is competitive with the business of Employer, nor will he directly or indirectly tamper with or induce any employees, agents, or customers of Employer to leave Employer or to stop buying from Employer, or to otherwise abandon Employer; and for a breach of the foregoing covenants, Employer, its successors and assigns, in addition to all other rights and remedies, shall be entitled to injunctive relief. The term "business of Employer" as used herein means and includes business in which Employer or any successor thereto (by merger or otherwise), or any present or future subsidiary or division of Employer is now engaged, and other or additional business in which Employer, and successor thereof, or subsidiaries, may be engaged hereafter as determined by the Board of Directors of Employer.

App. pp. 17–18.

The contract also provided that Unger's employment with FirstFed was for a period of one year and would automatically renew for one-year terms unless either party gave written notice of termination not less than ninety days prior to the expiration of the current one year term.

In 1997 or 1998, Unger was promoted to the position of president of FirstFed. On December 15, 2000, the chief executive officer of FFW Corp, Roger Cromer, informed Unger that his contract, which was due to expire on April 1, 2001, would not

---

1. Unger argues that the bank's customer list is not a trade secret under Indiana Code Section 24–2–3–2 and that it is not a protectible interest. We need not address this issue, however, because the trial court did not address it when it issued the preliminary injunction. The trial court, instead, based its preliminary injunction on Unger's breach of the noncompetition clause. The trial court will have the opportunity to determine whether the customer list is a trade secret in further proceedings.

be renewed. Although Unger was told not to return to work, he continued to receive his salary and benefits until his contract expired.

During the spring of 2001, Unger sent between 1000 and 1500 letters explaining the non-renewal of his contract to "[e]very-body and anybody that he could think of." Tr. p. 12. Unger testified that he used his calendar, old files, and the local phone book to compile the list of people to whom he sent the letter.

The letter refers to the recipient as "Patron" and reads in part:

I am uncertain when I will be able to resume providing you with the solid advice and good service you have been accustomed to receiving from me.

Your loyal patronage over the past ten years is sincerely appreciated and I look forward to being free to serve you again in the near future.

Ex. 3. The letter also contained Unger's address and phone number.

Cromer's father-in-law, Frank DeSantis, received one of Unger's letters. DeSantis's address was not in the local phone book and his only contact with FFW Corp consisted of a certificate of deposit with the bank and a possible solicitation by Unger at Cromer's request when Unger was employed at FirstFed. DeSantis and approximately fifteen other bank customers contacted the bank concerning their receipt of the letter.

On May 18, 2001, Unger ran an advertisement in the local newspaper for Unger Financial Group ("UFG"). The advertisement indicated that Unger provided full brokerage services including the sale of stocks, bonds, mutual funds, life insurance, and annuities.

On September 5, 2001, FFW Corp filed a complaint for injunctive relief and damages. The complaint alleged that Unger's operation of UFG was in violation of the employment contract's noncompetition clause; that Unger received compensation he was not entitled to; that Unger had customer lists that should be considered trade secrets in his possession and that misappropriation and use of the customer lists violated Indiana's Trade Secret Act; and that FFW Corp suffered damages and should be awarded treble damages, attorney fees, and costs. On November 5, 2001, the trial court held a hearing on FFW Corp's motion for preliminary injunction. On January 7, 2002, the trial court entered findings of fact and conclusions thereon enjoining Unger from conducting a financial services business in Wabash and adjacent counties and from contacting or soliciting customers of FFW Corp. Unger now appeals.

### Analysis

"The grant or denial of a preliminary injunction rests within the equitable discretion of the trial court and will be reversed only upon a showing of abuse of discretion." *Cohoon v. Financial Plans & Strategies, Inc.*, 760 N.E.2d 190, 193–94 (Ind.Ct.App.2001). The power to issue an injunction should be used sparingly, and such relief should not be granted unless the law and facts are clearly in the moving party's favor. *Id.* at 194. The trial court's discretion to grant or deny a preliminary injunction is measured by several factors: 1) whether the movant has an adequate remedy at law; 2) whether granting the injunction will disserve public interest; 3) whether the movant has established a reasonable likelihood of success at trial; and 4) whether the injury to the movant outweighs the harm to the party to be enjoined. *Norlund v. Faust*, 675 N.E.2d 1142, 1149 (Ind.Ct.App.1997), *trans. denied.*

In determining whether the trial court abused its discretion, we look to the trial court's findings of fact and determine

whether the findings support the judgment. *Cohoon*, 760 N.E.2d at 194. "We will not set aside the trial court's findings unless they are clearly erroneous. Findings are clearly erroneous when the record lacks any facts or reasonable inferences to support them." *Id.* (citation omitted). We consider the evidence in the light most favorable to the judgment and construe findings liberally in favor of the judgment. *Id.*

### I. Reasonable Likelihood of Success at Trial

■ Unger first appears to argue that FFW Corp has not established a reasonable likelihood of success at trial because the noncompetition clause was unreasonable and FFW Corp materially breached the contract when it terminated his employment.

### A. Noncompetition Clause

■ "In determining the reasonableness of the covenant not to compete, we examine whether the employer has asserted a legitimate interest that may be protected by a covenant." *Id.* If the employer has asserted a legitimate, protectible interest, we determine whether the scope of the agreement is reasonable in terms of time, geography, and types of activity prohibited. *Id.* "The employer bears the burden of showing that the covenant is reasonable and necessary in light of the circumstances." *Id.* The employer must demonstrate that "the former employee has gained a unique competitive advantage or ability to harm the employer before such employer is entitled to the protection of a

noncompetition covenant." *Id.* (citation omitted).

■ To show a legitimate protectible interest, "an employer must show some reason why it would be unfair to allow the employee to compete with the former employer."[2] *Titus v. Rheitone, Inc.*, 758 N.E.2d 85, 92 (Ind.Ct.App.2001). Unger argues that FFW Corp did not have a protectible interest in the bank's customer list. We need not determine whether the bank's customer list was a protectible interest because FFW Corp established a protectible interest in its goodwill.

■■ "As an incident to its business, an employer is entitled to contract to protect the good will of the business." *Cohoon*, 760 N.E.2d at 195. Goodwill includes secret or confidential information such as the names and addresses of customers and the advantage acquired through representative contact. *Id.* "These are property rights that an employer is entitled to protect." *Id.*

Here, Cromer testified that "[t]he banking industry is based on goodwill, trust and reputation and the confidentiality of the client lists are part of that." Tr. p. 49. He further testified "our reputation and trust is all built around how we do our banking. That's the strongest part of banking and when [the letter] came out people felt we had breached their confidentiality, their information and the trust they would have with us as bankers." *Id.* at 51. Based on this testimony, FFW Corp has demonstrated a legitimate protectible interest in its goodwill.

---

2. Unger argues for the first time in his reply brief that he did not owe a duty to the bank regarding the customer list because his employment contract was only with FirstFed. We will not address this argument, however, because in is original appellate brief Unger referred to FFW Corp, FirstFed, and the bank collectively as "the bank." Unger may not raise an issue for the first time in his reply brief. *See Felsher v. University of Evansville*, 755 N.E.2d 589, 593 n. 6 (Ind.2001); *see also* Ind.App. R. 46(C) ("No new issues shall be raised in the reply brief.").

█ Unger also argues that the noncompetition clause is unreasonably broad. He relies on *Burk v. Heritage Food Service Equipment, Inc.*, 737 N.E.2d 803, 812 (Ind.Ct.App.2000), in which we held that a noncompetition clause prohibiting a former employee from working for any other competitor, in any capacity, was unenforceable because it extended beyond the scope of the employer's legitimate interests. Unlike in *Burk*, however, Unger was only prevented from participating in any "business competitive with the business of Employer" in Wabash County and the six adjacent counties[3] for one year after the termination of employment. App. pp. 17–18.

Because this noncompetition clause is distinguishable from the clause in *Burk*, we determine whether the scope of the noncompetition clause is reasonable in terms of time, geography, and types of activity prohibited. *See Cohoon*, 760 N.E.2d at 194. Cromer testified that the one-year limitation would have allowed FirstFed to "entrust the customers with the new employees of FirstFed Financial. Then after that year if they so chose not to deal with FirstFed Financial ... they could always go someplace else and always join up with Mr. Unger...." Tr. pp. 83–84. This one-year restriction is a reasonable period of time to allow FFW Corp to reestablish its customers' confidence. Further, the noncompetition clause was limited only to Wabash County and the six adjacent counties. Because it is not uncommon for banks to have customers in surrounding counties, the geographic restrictions were reasonable. Finally, the noncompetition clause only prevented Unger from participating in a business that is competitive with FFW Corp, which provides a variety of financial services. Unger was therefore free to seek employment with any business that did not provide financial services. The noncompetition clause was reasonably limited in the type of activity that it prohibited.

FFW Corp has made a sufficient showing that it has a protectible interest in its goodwill and that the scope of noncompetition clause is reasonable in terms of time, geography, and types of activity prohibited. FFW has established a reasonable likelihood of success at trial on this issue.

### B. Material Breach

█ Unger contends that FFW Corp materially breached the contract when it terminated his employment prior to the expiration of the contract without cause. Unger points out that the first party to materially breach a contract cannot maintain an action against the other party should that party subsequently breach the contract. *See Titus*, 758 N.E.2d at 94. We find that FFW Corp did not materially breach the contract. FFW Corp informed Unger in writing that it would not renew his contract more than ninety days before it was due to expire, as was its prerogative under the contract. FFW Corp continued to pay Unger his salary and provide insurance benefits until the expiration of the contract. Although Unger did not receive a bonus for the first quarter of 2001, Cromer testified that the only way Unger would receive a bonus was if FirstFed was profitable. Cromer testified that FirstFed was not profitable during the first quarter of 2001.

Because Unger continued to receive a salary and benefits during the term of the contract, FFW Corp has shown that Unger was not terminated on December 15, 2000, and that FFW Corp did not breach the contract. FFW Corp has established a reasonable likelihood of success at trial on this issue.

---

3. These counties are Miami, Kosciusko, Whitley, Huntington, Grant, and Howard.

## II. Remedies available at Law

Unger also argues that FFW Corp did not establish that its remedies available at law were inadequate, which is required before it can state a claim for equitable relief. *See Martin v. Heffelfinger,* 744 N.E.2d 555, 558 (Ind.Ct.App.2001). Cromer testified, however, that his business had suffered damage to its goodwill, a loss of client confidence, a loss of business reputation, and a loss of the ability to compete fairly as a result of Unger's actions. Cromer further testified that he could not put a dollar amount on these damages. Because FFW Corp appears to have suffered more than mere monetary losses, the remedies available at law would not have been adequate. *See Norlund v. Faust,* 675 N.E.2d 1142, 1150 (Ind.Ct.App. 1997) (recognizing that where "[i]t would be pure speculation to place a dollar amount on the damages, and an injunction against the prohibited behavior is the most efficient way to lift the burden of that harm from the shoulders of the employer who contracted so as not to suffer such harm."), *trans. denied.*

### Conclusion

FFW Corp established a reasonable likelihood of success at trial. FFW Corp also established that adequate remedies were not available at law. The trial court, therefore, did not abuse its discretion in issuing a preliminary injunction.

Affirmed.

KIRSCH, J., and MATHIAS, J., concur.