Steven E. COATES, Appellant–
Defendant,

v.

HEAT WAGONS, INC. and Manufacturers Products, Inc.,
Appellees–Plaintiffs.

No. 64A03–1004–PL–232.

Court of Appeals of Indiana.

Feb. 23, 2011.

---

Edward P. Grimmer, Austgen Kuiper & Associates, P.C., Crown Point, IN, Attorney for Appellant.

Kathryn D. Schmidt, Jeremy J. Butler, Burke Costanza & Cuppy LLP, Merrillville, IN, Attorneys for Appellees.

## OPINION

BAILEY, Judge.

### Case Summary

Steven E. Coates ("Coates") appeals from the trial court's grant of a preliminary injunction against him and in favor of Heat Wagons, Inc., ("Heat Wagon") and Manufacturers Products, Inc. ("Manufacturers Products") (collectively, "MPI").

We affirm in part and reverse in part.

### Issues

Coates presents numerous issues, which we reframe and restate as whether the trial court abused its discretion in granting a preliminary injunction against him because

1. There is no risk of irreparable harm to PHP from Coates's continued operation of his business that would entitle PHP to a preliminary injunction, and prospective legal remedies will suffice to protect MPI's interests;

2. MPI did not establish its likelihood of success on the merits of its claim against him because the covenant not to compete is unenforceable and MPI committed the first material breach of the underlying employment agreement; and

3. The terms of the injunction are overly broad relative to the covenant it seeks to enforce.

## Facts and Procedural History

Coates's father, Harold Coates ("Harold"), was the majority shareholder in Heat Wagon and Manufacturers Products. Coates was a minority shareholder in Manufacturers Products. Manufacturers Products manufactures, sells, and leases large heaters in steel mills, portable heater units, heater parts, air conditioning systems, and other related goods. The portable heater parts division of Manufacturers Products is marketed separately as Portable Heater Parts or PHP (hereafter "PHP") and accounts for approximately 70% of Manufacturers Products' sales. Heat Wagon manufactures heaters and heater parts for large construction heaters, and sells the same types of products for other manufacturers.

Beginning in 1986, while still operating MPI, Harold started another business, Second Source. Second Source was also involved in the sale of portable heater parts. Harold's father would order parts through Second Source and sell them to PHP.

In April 1996, Harold died. On May 31, 1996, all of the shares in Manufacturers Products and Heat Wagon—including Coates's shares—were sold to John Walsh ("Walsh") and John Barney ("Barney"). The new owners of MPI retained Coates as an employee, and on May 29, 1996, Coates signed the Employment Agreement ("Agreement") at issue in this case.[1]

1. The Employment Agreement Coates signed designated both Heat Wagon and Manufacturers Products collectively as Coates's employer. It also included provision for regular increases in pay for Coates, set at a minimum of $2160.00 per year. The Agreement also included a covenant not to compete, with the provisions relevant to this case stating:

9. *Non–Competition by the Employee.* (a) The parties acknowledge that the Employee has gained and will continue to gain considerable confidential information about the businesses of the Employer, which could be injurious to the Employer if the Employee were to use such information for his own benefit. Therefore, the Employee agrees that during the term of his employment hereunder, and for a period of two (2) years after the effective date of the termination of the Employee's employment hereunder, the Employee shall not, directly or indirectly:
(i) in any capacity whatsoever, either as an individual or as a partner or joint venturer, or as an employee, agent or representative for any person or business enterprise, or as an officer, director, shareholder (having more than a nominal investment) or otherwise, engage in competition with the Employer, or any of them, in the manufacture, marketing, leasing, distribution or sale of products in, or services related to, heaters or heat-

ing or air conditioning systems and related parts and components markets in any of the states listed on *Exhibit A,* attached hereto;
(ii) disclose, divulge, discuss, copy or otherwise use or exploit or attempt to use or exploit in any manner in competition with or contrary to the interests of the Employer any customer lists or records, methods, business and marketing plans and strategies, financial information or any other trade secrets or proprietary information of any of the Employer, it being acknowledged by the Employee that all such information regarding the business of the Employer is confidential information the exclusive property of the Employer. Upon termination of his employment hereunder, the employee will promptly return the Employer all documents and records (in whatever form or medium) containing confidential or proprietary information of the Employer, including copies thereof then in the Employee's possession or control, whether prepared by him or others; or
* * *
(b) The Employee acknowledges that compliance with this section 9 is necessary to protect the goodwill and other proprietary interests of the Employer, and a breach will result in irreparable and continuing dam-

Coates remained an employee of MPI, and was assigned the title of sales manager. His primary work responsibilities included purchasing products for PHP to sell, aiding in the marketing and sale of those products by PHP, identifying new products to add to PHP's sales catalog, and assisting in price adjustments and setting customer pricing discounts. He also purchased 90% of the parts used to manufacture "large construction heaters" for a "sister company." (App.18.)

Beginning in April 1996, when he knew MPI would be sold to Walsh and Barney, Coates began to operate Second Source under the name S&S Supply ("S&S"). In particular, Coates continued to sell parts to MPI through S&S when S&S could buy and sell the products to MPI for a lower price than MPI could purchase the same parts, even after S&S took a mark-up on the goods. Sales to MPI constituted $228,535.23 of S&S's revenues from 1996 to 2009; sales to other customers in the same period amounted to only $3,030.00. (App.20.)

Coates hid his continued involvement in S&S from MPI. He did not inform MPI's management that he was operating S&S. Coates used addresses not · directly connected to him to operate the business, including a friend's address in Valparaiso as a mailing address and a UPS Store in Las Vegas, Nevada, as the address for S&S's checking account. When products S&S sold to MPI arrived at MPI from S&S's vendors, Coates would swap out the manufacturer's packing slips and replace them with S&S packing slips so that his involvement in S&S would not be revealed.

On May 1, 2009, Walsh terminated Coates's employment without cause. In March 2009, MPI ordered electric motors manufactured by Emerson Electric from S&S. After a computer irregularity with S&S's record on MPI's computers, an MPI employee located an Emerson Electric invoice associated with the order that showed S&S sharing its address with Coates's personal residence. MPI investigated and in July 2009 discovered Coates's role in S&S.

On July 20, 2009, MPI filed a complaint seeking to enjoin Coates from continued operation of Second Source/S&S, later amending the complaint to pursue damages for breach of contract. Coates answered and entered a counterclaim for declaratory relief and compensatory damages.

On November 25, 2009, MPI filed its Verified Petition for Preliminary and Permanent Injunction. On April 12, 2010, after the parties filed stipulated facts and exhibits and a hearing, the trial court entered its Order Granting Preliminary Injunction ("the Order") against Coates.

This appeal followed.

## Discussion and Decision

### I. *Standard of Review*

 To obtain a preliminary injunction, the moving party must show by a preponderance of the evidence that: (1) its remedies at law are inadequate and that irreparable harm will occur during the pendency of the action as a result; (2) it has at least a reasonable likelihood of success on the merits by establishing a prima facie case; (3) the threatened harm it faces outweighs the potential harm the injunction would pose to the non-moving party; and (4) the public interest would not be

---

age to the Employer for which there will be no adequate remedy at law. In the event of any breach by the Employee of the covenants contained herein, the Employer will

be entitled to injunctive and other such relief, including the award of damages, as may be proper.
(App. 36–37; emphasis in original.)

disserved by granting the injunction. *Zimmer, Inc. v. Davis,* 922 N.E.2d 68, 71 (Ind.Ct.App.2010). We review a trial court's grant of a party's motion for a preliminary injunction for an abuse of discretion. *Id.* Failure to prove any of the elements required for a grant of a preliminary injunction constitutes an abuse of discretion. *Id.*

 Trial Rule 65 sets forth the procedure governing injunctive relief. "Every order granting [a] temporary injunction ... shall include or be accompanied by findings as required by Rule 52." Ind. Trial Rule 65(D). We review the special findings and conclusions required under Trial Rule 52 for clear error. T.R. 52(A).

> Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. We consider the evidence only in the light most favorable to the judgment and construe findings together liberally in favor of the judgment.

*Robert's Hair Designers, Inc. v. Pearson,* 780 N.E.2d 858, 863 (Ind.Ct.App.2002) (citations omitted).

## II. Irreparable Harm

Coates contends that MPI does not face a risk of irreparable harm and does not lack an adequate remedy at law. Thus we first consider whether the trial court abused its discretion in determining that MPI may have suffered irreparable harm.

 Irreparable harm is that harm which cannot be compensated for through damages upon resolution of the underlying action. *Ind. Family & Soc. Svcs. Admin. v. Walgreen Co.,* 769 N.E.2d 158, 162 (Ind. 2002). "Mere economic injury" is not enough to support injunctive relief. *Id.* at 162. The trial court should only award injunctive relief where a legal remedy will be inadequate because it provides incomplete relief or relief that is inefficient "to the ends of justice and its prompt administration." *Robert's Hair Designers,* 780 N.E.2d at 864 (quoting *Washel v. Bryant,* 770 N.E.2d 902, 906–907 (Ind.Ct.App. 2002)).

Our decision in *Robert's Hair Designers* is illustrative of the proper use of a preliminary injunction. In that case, we reversed a trial court's denial of a preliminary injunction against former employees of a hair salon despite the salon's ensuing increase in revenue. *Robert's Hair Designers,* 780 N.E.2d at 865. We noted that the salon's inability to quantify its loss was "irrelevant" because the loss of goodwill and future revenue when its employees departed, taking the salon's customers with them, "would warrant a finding of irreparable harm." *Id.*

 Here, the trial court noted in its order that "there is no apparent way to measure the loss of sales to PHP, nor is there any way to measure the amount of business that has already been taken from PHP by Coates." (Appellant's App. 9.) Coates's continued involvement in the sale of heater parts after his termination by MPI could constitute irreparable harm because of Coates's knowledge of the portable heater market, his knowledge of vendors, and his recognition by both vendors and customers. Moreover, Coates's competition poses a significant potential of future harm to MPI because each party would be in competition with the other for a limited supply of DESA parts as a result of that company's 2008 closing. Coates's competition with PHP holds a potentially unique risk of harm because of how well informed Coates was on DESA products as a result of his work for PHP.

In light of the foregoing, we cannot say that the trial court's order is clearly erroneous on the question of irreparable harm or lack of adequate remedy at law.

### III. Reasonable Likelihood of Success on the Merits

Coates argues that MPI did not establish by a preponderance of the evidence that it could produce evidence to establish a prima facie case for its claim. *See Zimmer*, 922 N.E.2d at 71. Thus, Coates argues, MPI failed to meet the requirement that it prove a reasonable likelihood of success on the merits at trial. *See id.* In particular, Coates argues that 1) MPI lacked a legitimate interest subject to protection by the covenant not to compete, or at least that the trial court's order is defective for lack of significant evidence on this point; 2) the scope of the covenant's restrictions upon Coates's activities and the region in which he may conduct business are unreasonable; and 3) MPI committed the first material breach of the agreement in which the covenant appears and thus Coates was not bound by the covenant.[2] We must therefore evaluate MPI's evidence on the merits of its substantive claim though, as noted above, we review the trial court's findings and judgment for clear error, and its decision to grant the preliminary injunction for an abuse of discretion.

### A. Whether MPI had a Legitimate Interest

Indiana courts strongly disfavor as restraints of trade covenants not to compete in employment contracts. *Central Ind. Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 728–29 (Ind.2008) (citations omitted). Such covenants are construed strictly against employers. In order to be enforceable, the provisions of a covenant not to compete must be reasonable, which is a question of law. To be reasonable, an agreement containing such a covenant must protect legitimate interests of the employer, and the restrictions established by the agreement must be reasonable in scope as to time, activity, and geographic area. *Id.* at 729.

A legitimate protectable interest is an advantage possessed by an employer, the use of which by the employee after the end of the employment relationship would make it "unfair to allow the employee to compete with the former employer." *MacGill v. Reid*, 850 N.E.2d 926, 930 (Ind.Ct.App.2006) (quoting *Unger v. FFW Corp.*, 771 N.E.2d 1240, 1244 (Ind. Ct.App.2002)). This court has held that goodwill, including "secret or confidential information such as the names and address of customers and the advantage acquired through representative contact," is a legitimate protectable interest. *Pathfinder Comm. Corp. v. Macy*, 795 N.E.2d 1103, 1110 (Ind.Ct.App.2003) (quoting *Unger v. FFW Corp.*, 771 N.E.2d 1240, 1244 (Ind. Ct.App.2002)). Also subject to protection as goodwill is the competitive advantage gained for an employer through personal contacts between employee and customer when the products offered by competitors are similar. *Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164, 173 (Ind.Ct. App.2008). The "general skills" acquired in working for an employer, however, may be transferred unless this occurs "under circumstances where their use [is] adverse to his employer and would result in irreparable injury." *Pathfinder*, 795 N.E.2d at 1110 (quoting *Duneland Emergency Physician's Med. Group, P.C. v. Brunk*, 723

---

2. Coates also argues that the trial court's order is defective for lack of significant evidence to support its injunction against Coates's use of certain trade names. Because this claim relates to the scope of the order rather than the elements of the underlying claim, we address this issue with Coates's other challenges to the scope of the injunction. *See infra.*

N.E.2d 963, 966 (Ind.Ct.App.2000), *trans. denied*).

Here, the trial court found that "Coates had retained his knowledge of the business and used that knowledge to acquire/retain customers that he had prior transactions with through PHP." (Appellant's App. 10.) The court held that these aspects of Coates's knowledge, as well as the knowledge of customer requirements Coates obtained "through representative contact," constituted a legitimate protectable interest, as did MPI's right to "restrict a former employee from enticing away the employer's old customers." (Appellant's App. 10.)

We cannot say here that the trial court's findings and conclusions were clearly erroneous. Among the facts to which both Coates and MPI stipulated was that Coates was involved in "price adjustments" for customer orders and that he played a significant role in identifying products for PHP to sell to its customers and carry in its catalog. (Appellant's App. 18.) Coates and MPI further stipulated that "Coates is selling to customers to whom he sold when he was at PHP." (Appellant's App. 22.) Coates testified that he knew customer names and had handled sales calls when required to do so. Coates also testified that though he did not actively comb the American Rental Association ("ARA") mailing list for PHP customers, neither did he attempt to filter out existing PHP customers from the ARA list he purchased.

The nature of the heater parts market in which PHP operates further illustrates a protectable interest. PHP was the primary supplier of DESA Master heaters and heater parts, a market which became much more competitive when DESA ceased operation in late 2008. PHP—at Coates's urging—began to seek DESA heaters and parts in an effort to acquire additional market share and supply the substantial market for DESA parts. Coates's knowledge of and familiarity with the DESA heater parts market, and the portable heater parts market in general, was a commercial advantage developed while he worked for PHP. We thus cannot agree with Coates that the trial court arrived at its findings of fact without supporting evidence.

Nor can we agree with Coates that the trial court erred as a matter of law in determining that these facts gave rise to a protectable interest. It is true that general skills and knowledge travel with an employee without being subject to restriction by a covenant not to compete. *See, e.g., Pathfinder,* 795 N.E.2d at 1110. Yet much of Coates's knowledge of the heater market and of the identity and needs of PHP's customers on price is not general skill or knowledge—it is specific to how PHP operates. Coates's use of this knowledge could permit him to compete unfairly by allowing him to undercut PHP's sales using information gained only because he was an MPI employee. Thus, we cannot say that the order is clearly erroneous for lack of evidence and inferences supporting the court's conclusion that MPI had a legitimately protectable interest in Coates's knowledge of its customers and market.

### B. Scope of the Restrictions

Coates further contends that even if MPI had a legitimate interest capable of protection through a covenant not to compete, the scope of the restrictions the covenant imposes upon him is unreasonable and thus the covenant is void.

When reviewing the scope of restrictions in a covenant not to compete, we review the time, geography, and types of activity the covenant prohibits. *Gleeson,* 883 N.E.2d at 174. If a covenant is

unreasonable as written, courts may not create a reasonable restriction under the guise of interpretation. *Licocci v. Cardinal Assocs., Inc.,* 445 N.E.2d 556, 561 (Ind. 1983). However, where a provision of a restriction is unreasonable, the blue pencil doctrine permits courts to strike that provision from those which are reasonable if the unreasonable restrictions are divisible from the rest. *Dicen v. New Sesco, Inc.,* 839 N.E.2d 684, 687 (Ind.2005). Coates makes no argument as to the duration of the restriction, challenging only the reasonableness of the restrictions on the geographical scope and nature of his activities and the trial court's order as it relates to the blue pencil doctrine.

### Geographic Scope

■■■ Whether the scope of a covenant's geographic restrictions is reasonable depends upon the employer's interest served by those restrictions. *Krueger,* 882 N.E.2d at 730. Here, the trial court's order states that since "Coates had contacts with customers and vendors in (19) nineteen of the (32) thirty two [sic] states since his employment . . . the court strikes the thirteen states with which Coates had no contact and enforces the restriction as to the nineteen states with which Coates did have contact." [3]

■■■ As a nearly-nationwide business, MPI has an interest in protecting its interests in each state in which it conducts business in the heater and heater parts market. Coates admitted, in the Stipulated Facts submitted to the trial court, to having had contact with customers or vendors in the nineteen states listed in the injunction. In each of the nineteen states, PHP had sales in excess of $20,000 per year in both 2008 and 2009, with some

states seeing sales of nearly $500,000 in one or both years. Indeed, PHP had sales in *all* of the states listed in Exhibit A of the Employment Agreement, with many states seeing sales in excess of $20,000 in both 2008 and 2009. In light of Coates's knowledge of and contact with PHP's customers and vendors and his knowledge of PHP's business—all acquired while Coates was an MPI employee—we cannot say that the trial court's determination in its Order that the geographical provision of the non-compete "is reasonable and enforceable" was clearly erroneous. *Cf. Dicen,* 839 N.E.2d at 689 (holding that a covenant not to compete that restricted a former employee from "working in the land remediation business anywhere in the United States" unreasonable when employee's "contacts were in a limited number of states").

Nor did the trial court err in its use of the blue pencil doctrine to restrict the scope of the Order to the nineteen states in which Coates had customer contact. In *Dicen,* our supreme court held that use of the blue pencil doctrine to strike the geographical limitations of an employment agreement's covenant not to compete whose geographical scope encompassed the entire United States would result in "no geographical limitation at all." *Id.* The court therefore held the entirety of the covenant not to compete unenforceable. *Id.* Though the court in *Smart Corp. v. Grider* did approve a non-compete of similar scope ("any county of any state in the United States . . . where the Company . . . then carries on a like business"), it did so only because a portion of the covenant in question included a trailing phrase, "to the extent permitted by applicable law." 650 N.E.2d 80, 82 (Ind.Ct.App.1995) (dis-

---

**3.** The states listed by the Order are Illinois, Indiana, Kansas, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New York, New Jersey, Ohio, Pennsylvania, South Dakota, Tennessee, Texas, Washington, West Virginia, and Wisconsin.

approving of "catch all" language but enforcing it under the circumstances of the case before the court), *trans. denied.*

Here, the trial court had before it a covenant not to compete that referred to a specific exhibit listing individual states, each of which could be stricken without resulting in the absence of any limitation of the geographical scope of the covenant. The listing of states in Exhibit A of the Employment Agreement is not at all like the "catch all" language in *Grider* which, much like the covenant in *Dicen,* sought to limit all activity by the restricted employee throughout the entirety of the United States without regard to the extent of the employer's interest with respect to the employee. *Compare id.* at 84 n. 1, *with Dicen,* 839 N.E.2d at 689. The trial court's decision to strike those states with which Coates had no contact did not require reinterpretation of the contract, and was thus not clearly erroneous.

### Scope of Activities

We turn now to whether the scope of the restriction on Coates's activities is unreasonable. The reasonability of a covenant not to compete's restrictions on the activities of an employee is determined by the relationship between the interest the employer seeks to protect and the activities circumscribed by the provisions of the covenant. Provisions in a covenant not to compete are invalid if they prohibit competition with portions of a business with which an employee had no association or activities that are seemingly harmless in relation to the protected interest. *Mac-Gill,* 850 N.E.2d at 930–31 (quoting *Seach v. Richards, Dieterle & Co.,* 439 N.E.2d 208, 214 (Ind.Ct.App.1982)). This court has therefore found as overbroad and therefore invalid covenants not to compete that restrict an employee from working for any competitor of a prior employer in any capacity and those that restrict employees

from engaging in their profession in a large geographic area. *Id.* at 932–33 (quoting, *inter alia, Norlund v. Faust,* 675 N.E.2d 1142, 1155 (Ind.Ct.App.1997), *clarified on denial of reh'g,* 678 N.E.2d 421 (Ind.Ct.App.1997), *trans. denied; Pathfinder,* 795 N.E.2d at 1114; *Unger,* 771 N.E.2d at 1245).

The covenant at issue in this case restricts Coates from:

> in any capacity whatsoever, either as an individual or as a partner or joint venturer, or as an employee, agent or representative for any person or business enterprise, or as an officer, director, shareholder (having more than a nominal investment) or otherwise, engag[ing] in competition with the Employer, or any of them, in the manufacture, marketing, leasing, distribution or sale of products in, or services related to, heaters or heating or air conditioning systems and related parts and components markets . . .

(App.36.)

The Agreement identifies "Employer" collectively to include both Heat Wagon and MPI, the plaintiffs in this case. (App.34.) Coates contends that his "primary job responsibility was as a distributor of portable heaters, their parts and other items shown in its catalogue" (Appellant's Br. 26.), that is, he worked primarily for PHP, a division of MPI. From this, argues Coates, come two corollaries. First, because he worked primarily for PHP dealing with portable heater parts, the inclusion of Heat Wagon in the definition of Employer is impermissibly broad because Heat Wagon deals with large construction heaters instead of portable heaters. Thus Coates urges that the term "Employer" must be blue penciled and, when this occurs, the covenant lacks meaning without an impermissible reinterpretation of the Agreement. Second, because

he worked in portable heater parts and the covenant lacks the word "portable," the covenant is overly broad and cannot be reasonable without inserting the word "portable" into its text. The insertion of a new term by the court, Coates notes, would be an impermissible use of the blue pencil doctrine.

■ We are not persuaded by this argument. As to the interpretation of "Employer," it is true that Coates's pay came from MPI and not Heat Wagon. However, Coates stipulated that his LinkedIn.com profile stated (and he thereby admitted) that

> I purchase all items to fulfill sales obligations for our wholesale catalog company. Annual purchase of $3M+.

> I also purchase 90% of the production parts for our *sister company that manufactures large construction heaters.*

(App. 18; emphasis added.) PHP is not a separate corporation, but is rather an unincorporated division of Manufacturers Products with no separate legal existence from it. PHP's sister company is Manufacturers Products' sister company—Heat Wagon. Heat Wagon manufactures large construction heaters.

Thus, the trial court could conclude from the evidence before it that Coates performed work for both Manufacturers Products/PHP and Heat Wagon, and inclusion of both companies within the definition of Employer did not require blue penciling. We acknowledge that covenants not to compete are interpreted to favor the employee, not the employer. *Krueger,* 882 N.E.2d at 729. Yet it is clear from the evidence before the trial court that Coates performed work for both MPI and Heat Wagon and that both Coates and MPI/Heat Wagon knew this. The scope of the definition of Employer is thus not, in this context, impermissibly broad.

Coates's other attack—that the omission of "portable" from before "heaters" and "heating" is overly broad in relation to MPI's protectable interest—fails for similar reasons. Coates worked for both Heat Wagon and Manufacturers Products, and Heat Wagon's primary business was in the manufacture of larger commercial heaters. (Indeed, he purchased as much as 90% of the production parts for Heat Wagon). The omission of the term "portable" thus does not make the non-compete provision overbroad. *Cf. MacGill,* 850 N.E.2d at 930–31 (noting as overbroad covenant provisions where an employee had "no association" with the employer's engagement in a proscribed activity).

We therefore conclude that the trial court's interpretation and blue penciling of the scope provisions of the covenant not to compete was not clearly erroneous.

### C. First Breach of the Employment Agreement

Coates next asserts that, even if the covenant not to compete applies to a legitimate protectable interest and is not overbroad in its restrictions, the covenant is nevertheless unenforceable because MPI committed the first material breach of the Employment Agreement by failing to pay the specified annual salary increases.

■ When one party to a contract commits the first material breach of that contract, it cannot seek to enforce the provisions of the contract against the other party if that other party breaches the contract at a later date. *Licocci,* 492 N.E.2d at 52. Whether a party has materially breached an agreement is a question of fact and is dependent upon several factors including:

> (a) The extent to which the injured party will obtain the substantial benefit which he could have reasonably anticipated;

918

(b) The extent to which the injured party may be adequately compensated in damages for lack of complete performance;

(c) The extent to which the party failing to perform has already partly performed or made preparations for performance;

(d) The greater or less hardship on the party failing to perform in terminating the contract;

(e) The willful, negligent or innocent behavior of the party failing to perform;

(f) The greater or less uncertainty that the party failing to perform will perform the remainder of the contract.

*Tomahawk Vill. Apartments v. Farren,* 571 N.E.2d 1286, 1293 (Ind.Ct.App.1991) (citation omitted).

 Here, Coates's attack on the trial court's determination that he, not MPI, committed the first material breach of the Employment Agreement takes three approaches. He first argues that MPI did not pay the minimum annual salary increase it promised to him in the Agreement, and that this constitutes MPI's breach. He then argues that his activity through S&S was not prior to MPI's breach because "[w]hether there is a breach depends solely on the language of the contract and not how distasteful the court or MPI's officers think Coates' [sic] conduct was." (Appellant's Br. 32–33.) Because the covenant not to compete contains no express prohibitions against Coates purchasing parts or selling goods to MPI, the argument goes, he has not breached the Agreement since it lacks a "prohibition of self dealing" that other such Agreements might have. (Appellant's Br. 33.)

 Stated another way, Coates seeks to escape the requirements of good faith and fair dealing in an employment agreement that "formalized the employ-ment relationship" between himself and MPI "beyond the normal employment at will situation." *Weiser v. Godby Bros., Inc.,* 659 N.E.2d 237, 239 (Ind.Ct.App. 1995) (Sullivan, J., plurality opinion) (citing *Prudential Ins. Co. of America v. Crouch,* 606 F.Supp. 464 (S.D.Ind.1985), *aff'd* 796 F.2d 477 (7th Cir.1986)), *trans. denied.* In Indiana law, implied covenants of good faith and fair dealing apply only to insurance and employment contracts or where contracts are ambiguous as to the application of the covenants or expressly impose them. *Allison v. Union Hosp., Inc.,* 883 N.E.2d 113, 123 (Ind.Ct.App.2008) (citing *Lake County Trust Co. v. Wine,* 704 N.E.2d 1035, 1039 (Ind.Ct.App.1998); *First Fed. Sav. Bank of Ind. v. Key Markets, Inc.,* 559 N.E.2d 600, 604 (Ind.1990)). Among the duties imposed by the covenants of good faith and fair dealing in an employment relationship is that of loyalty to the employer and avoiding self-serving conduct. Thus, this court has held that preparation for competition against an employer is not a violation of the duty of loyalty and the prohibition against self-dealing so long as the employee "continue[s] to exert his best efforts on behalf of his employer." *Kopka, Landau & Pinkus v. Hansen,* 874 N.E.2d 1065, 1070 (Ind.Ct. App.2007) (going on to cite *Potts v. Review Bd. of Ind. Emp. Sec. Div.,* 475 N.E.2d 708, 712 (Ind.Ct.App.1985), *trans. denied* ).

Here, Coates sold parts to MPI through his own company, S&S, through which he continued a pattern of sales that his father had engaged in when his father was the majority shareholder of MPI. Coates began to sell parts to MPI when he knew the company was about to be sold to new owners, intending not only to draw wages from his employment but also to profit from sales he made through S&S. Coates did not disclose this arrangement to MPI's new owners at the time he entered into the Employment Agreement or at any time

thereafter. Indeed, MPI did not discover Coates's status as the sole owner and operator of S&S until after it had dismissed Coates from employment, and after having paid S&S (and thereby Coates) more than $220,000 over the course of 13 years—hardly an insubstantial sum.[4]

Coates seeks to excuse this conduct by noting that he did this only with parts that S&S could acquire at a lower price than MPI, thereby helping MPI pay less for the same products. Coates did not, however, introduce evidence as to why he could not—nor why he should not—have attempted, as an employee of MPI, to obtain those prices directly for his employer, thereby saving both the cost of the goods *and* the markup he assessed in selling the goods to MPI himself. Coates also used business addresses other than his own residence—including an address in Nevada for S&S's checking account—with the purpose of hiding his involvement in the business from other MPI employees, stating that his involvement with S&S was "none of their business." (Tr. 23.)

We note that Coates did not have a strictly traditional at-will employment contract with MPI, in that he was afforded certain financial protections in the event of discharge from employment without cause. MPI's ability to dismiss Coates without cause and Coates's ability to leave employment with MPI, each without breaching the Agreement, does not so muddy the waters as to relieve Coates of the duties imposed upon employees in at-will contracts or employment contracts in general. *Cf. Weiser*, 659 N.E.2d at 239 (noting that deviation through written agreement from the normal terms of an at-will employment

relationship did not bring into question the right of an employer to summarily terminate an employee).

The trial court could reasonably conclude from the evidence before it that Coates breached the implied covenants of good faith and fair dealing imposed upon him by his employment with MPI before MPI failed to issue him pay raises in compliance with the terms of the Employment Agreement. Indeed, Coates likely breached these covenants almost as soon as he entered into the Agreement. The trial court's holding that Coates made the first material breach of the Agreement and that MPI could therefore enforce the covenant not to compete was not clearly erroneous.

### IV. Provisions of the Order

In various parts of his argument, Coates challenges the text of the Order itself, arguing that the injunctive provisions of the Order impermissibly reinterpret and expand the scope of the covenant not to compete. Coates assigns error to the court's instruction that "Defendants, Coates and Second Source, shall refrain from contacting current and former customers and vendors of the Plaintiffs and shall not accept solicitation or contact from Plaintiffs' current and former customers immediately with regards to heaters or heater parts." (App.14.) This provision of the Order is impermissibly broad, Coates explains, because

> it would be a violation for [him] to shop at his hometown Walmart where PHP would occasionally purchase products. It would prohibit having contact, even when not targeted at a former customer

---

4. As an example, Coates stipulated that S&S charged MPI $165 per electric motor when Emerson Electric charged S&S only $65 per motor. Thus Coates acting through S&S while simultaneously employed by MPI imposed a markup of $100 per motor on a transaction involving 95 motors. (App.20–21.) S&S paid Emerson Electric $6,045.00, and received $14,374.00 from MPI after a prompt payment discount, resulting in a gross profit of $8,329.00 for S&S.

(or vendor) from any information or recollection from the prior employment for the sale or purchase of non-heater and heater part items [sic]. Instead of a precise rifle approach, hand grenade [sic] is employed by the court.

(Appellant's Br. 28.)

Setting aside our concerns about the opacity of the second sentence in this quote, we recognize that the language of the trial court's order could have been crafted with more precision. However, exercising common sense and reading the Order to avoid an absurd result yields an interpretation of the Order that requires Coates to "immediately, with regard to heaters or heater parts, 1) refrain from contacting current and former customers and vendors of the Plaintiffs, and 2) not accept solicitation or contact from Plaintiffs' current and former customers." Read this way, we believe the trial court's order is not overbroad and does not impose restrictions impermissibly beyond the scope of the underlying covenant not to compete the Order seeks to enforce. This interpretation comports with subparagraph (a)(ii) of the covenant regarding the use of customer information and PHP's marketing strategies, the validity of which covenant Coates does not challenge. We therefore conclude that the trial court's imposition of this provision of the preliminary injunction does not constitute an abuse its discretion.

Coates also argues that the trial court's order is in error when it requires him to

Stop using the marks "H&P" and/or "Heaters and Parts" for any portion of either's [Coates or Second Source] business. Coates and Second Source, as well as their employees or agents, shall stop using the website *www.heaters andparts.com,* and ... stop using the marks "H&P" and/or "Heaters and Parts" on any website or other publica-

tion or advertisement. Steps to cease using the marks must be taken immediately.

(App. 14; emphasis in original.) Specifically, Coates argues that the trial court had no evidence and made no findings regarding confusion or dilution as a result of his use of the various marks and Web addresses. MPI argues that the trial court's order on these points need not be supported by specific findings and is reasonable in light of the purpose and provisions of the order that seek to restrict Coates's unfair competition with MPI.

The trial court had some evidence before it in the form of stipulated facts and exhibits that allowed it to compare Coates's and PHP's use of each one's marks. Coates's company, S&S, used the Web site www. heatersandparts.com and a red "H&P" mark on that Web site and on printed materials. PHP used a red "PHP" mark and the Web site www.portableheater parts. Coates solicited and carried on business with some of PHP's customers, operating in the same commercial organization (the ARA) as PHP.

■ However, we agree with Coates that the trial court's order enjoining any use by Coates of www.heatersandparts. com and the red "H&P" mark is an abuse of discretion. There was no evidence that Coates's use of the Web site or the mark created any confusion among its current or potential customers, nor did the trial court make specific findings of confusion as required under Trial Rule 52. We note further that because neither Coates nor PHP asserted any claims or defenses under trademark law, whether Coates's use of the Web site and mark were confusing is likely more properly heard in Federal court under the Lanham Act. *See* 15 U.S.C. § 1051 *et seq.* Finally, the relief granted by the trial court in its order is overly broad in relation to the otherwise

appropriate geographic scope of the covenant. By restricting Coates from any use of the Web address and mark, the trial court effectively restricted Coates from using these means of advertising anywhere in the United States (and potentially internationally), where the geographic scope of the restrictions in the order encompass only nineteen states.

The absence of restrictions upon Coates's use of the Web address and mark does not prevent PHP from enforcing its rights to restrict Coates's sales to customers within the nineteen states encompassed by the injunction. Any sale by Coates to such customers would constitute an actionable violation of the injunction regardless of the channel through which the sale was conducted. Because of the over-breadth of the trial court's order, we cannot agree with PHP that it was within the trial court's discretion to enjoin Coates's use of the www.heatersandparts. com Web address and red "H&P" mark.

### Conclusion

The trial court did not err in determining that MPI faced a risk of irreparable harm and lacked adequate remedy at law as a result of any breach by Coates of the covenant not to compete. It also did not err in determining that MPI has a reasonable likelihood of success on the merits of its case. Finally, the restrictions imposed by the preliminary injunction upon Coates's use of the Web address www. heatersandparts.com and the red "H&P" logo are overly broad.

Affirmed in part, reversed in part.

RILEY, J., concurs.

KIRSCH, J., dissents with separate opinion.

KIRSCH, Judge, dissenting.

I respectfully dissent.

Covenants not to compete in employment contracts are in restraint of trade and have long been disfavored in the law. *See Donahue v. Permacel Tape Corp.*, 234 Ind. 398, 127 N.E.2d 235 (1955). To be enforceable, the scope of the restriction on competition in a covenant not to compete in an employment contract must be reasonable in terms of duration, activity and geographic area. *Sharvelle v. Magnante*, 836 N.E.2d 432, 436 (Ind.Ct.App.2005). I believe the covenant now before us fails to meet this standard in terms of both activity and geographic area.

The covenant provides:

... Employee shall not, directly or indirectly:

*(i) in any capacity whatsoever,* either as an individual or as a partner or joint venture, or as an employee or agent or representative for any person or business enterprise or as an officer, director, *shareholder* (having more than a nominal investment) *or otherwise engage in competition with the Employer,* or any of them, *in the manufacture,* marketing, leasing, *distribution,* or sale of products in, or services related to, heaters or heating or air conditioning systems and related parts and components markets in any of the states listed on *Exhibit A* attached hereto.

*Appellant's App.* at 36 (emphasis added).

The purpose of the covenant here at issue is not to protect the employer's trade or business secrets. Rather, its purpose is solely to prevent competition by restricting the employee from engaging in competition with employer "in any capacity whatsoever" and would prevent the employee from competing in any way with the employer. Included in the prohibited actions is owning stock in any company engaged in the heating and air conditioning business. This would include owning stock as an

investor. Also prohibited would be working in manufacturing in any heating and air conditioning business even though the employee never worked for employer in manufacturing.

In regard to geographic scope, the restriction applied to all states in which the employer does or has done business, without regard to whether the employee has ever had any involvement in such states. While the trial court invoked the blue pencil doctrine to exclude thirteen of the thirty-two states listed on the exhibit because the employee had had no contact with businesses in such states, there was no showing of the extent of employees involvement in the remaining states.

I also question the re-writing of a contract as a matter of policy. A restrictive covenant in an employment contract is to be strictly construed against the employer. *See Central Ind. Podiatry, P.C v. Krueger,* 882 N.E.2d 723, 728–29 (Ind.2008). The restrictive covenants will be unenforceable if they are unreasonable in scope as to duration, activity and geographic area. *Id.* Here, as a result of re-writing the employer's contract by the trial court, a contract that is unreasonable in its scope and unenforceable as over-broad becomes enforceable against the employee.

I believe that the restrictive covenant is unenforceable in its entirety. I would reverse the trial court and remand with instructions to dissolve the preliminary injunction.