## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 17 2019, 7:43 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Clinton E. Blanck
Blanck Legal, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Ann Marie Waldron
Waldron Law
Indianapolis, Indiana

John Thomas Funk
Benjamin Spandau
Tate Bowen Daugherty
Funk Spandau LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Immense Salon & Spa, LLC, and Michael J. Covington, *Appellants-Plaintiffs,* v. Linda L. Williams, Kevin D. Williams, Melvin D. Brandenburg, and Studio 2000, Inc., *Appellees-Defendants* | December 17, 2019 Court of Appeals Case No. 19A-PL-1048 Appeal from the Marion Superior Court The Honorable Heather A. Welch, Judge Trial Court Cause No. 49D01-1601-PL-2403 |

**Baker, Judge.**

[1] Immense Salon & Spa, LLC (Immense), and Michael J. Covington (collectively, the Purchasers) appeal the trial court's order entering final judgment in favor of Linda Williams, Kevin Williams, Melvin Brandenburg (collectively, the Sellers), and Studio 2000, Inc. (Studio 2000), on the Purchasers' complaint seeking specific performance of the contract between the parties. The Purchasers argue, essentially, that the Sellers breached the contract first and are not entitled to rescission. Finding that the Purchasers were the first breaching party and that the trial court did not err by ordering rescission and declining to order specific performance, we affirm.

## Facts

[2] Sometime in 2015, Covington, who is the sole managing member of Immense, offered to purchase Studio 2000 from the Sellers. In July 2015, the Sellers informed Covington that they had hired a broker, David Gorman, to help negotiate the sale of the business. Following discussions, a letter of intent was negotiated by Covington and Gorman. At that point, an attorney was hired to draft the transactional documents.

[3] Among the documents was a Corporate Stock Purchase Agreement (Purchase Agreement). The purchase price for Studio 2000 totaled $660,108.70, and payment was structured as follows:

- $240,000 in the form of a cashier's check or wire transfer at closing (the Down Payment);
- a credit of $55,000 from Sellers to Covington for gift cards previously sold by Sellers and unredeemed;

- a $90,500 payment to be paid on or before May 15, 2017, which was evidenced by promissory notes executed by Covington and Kimberly Morgan-Dade;[1]
- an amount of up to $140,000 in future gift card sales;
- $47,108 for costs of inventory (to be adjusted by a final valuation at closing); and
- $87,500 to be paid by December 1, 2016, plus annual interest accruing at 6%.

Covington planned to acquire Studio 2000 through a series of loans on the assets of Studio 2000 and its future business rather than using any of his own cash. He applied for several loans before December 2015. In those loan applications, he stated that he was the owner of Studio 2000 and had been the owner for as long as a year, even though he had not yet purchased the company. Morgan-Dade also applied for financing as an owner of Studio 2000, claiming ownership going back at least a year.

[4]     The parties agreed to close the deal on December 2, 2015. A few hours before the scheduled closing, Covington sent a revised Purchase Agreement to Sellers that added a last-minute change to the language. Specifically, he inserted a Document Closing, to occur on December 2, 2015, and a Funding Closing, to allow Covington to pay the Down Payment by the end of business on December 4, 2015. Covington made no other changes to the Purchase Agreement, which contains multiple sections referring to a single closing and

---

[1] Morgan-Dade is Covington's friend; she is not an officer or member of Immense. Covington planned for her to run the salon after the transaction was completed. She attended four meetings leading up to the closing and ultimately signed the promissory note as an individual.

requiring Covington to pay the Down Payment at the December 2, 2015, closing. While the Sellers agreed to the change in language, no one other than Covington believed that Covington would own Studio 2000 or that the sale would be completed until payment of the Down Payment on December 4, 2015.

[5] After the documents were signed on December 2, but before the Down Payment was made on December 4, Kay Fleming, the Purchasers' attorney, changed the records with the Indiana Secretary of State to show Covington (not Immense) as the owner of Studio 2000 and to show herself as the registered agent.

[6] Beginning on December 3, Covington began indicating to the Sellers that he would not be able to pay the Down Payment on December 4. From December 3 through December 11, the Sellers attempted to work with Covington regarding the Down Payment. On December 7, 2015, a partial payment in the amount of $92,730 was made to the Sellers from Quarterspot, a lending company.

[7] At some point, the Sellers learned about the change the Purchasers had made to the Secretary of State records; they believed that the change was improper given their understanding that the transaction would not be fully executed and final until the Purchasers paid the full Down Payment. As a result, on December 14, 2015, having still not received the full Down Payment, the Sellers sent a letter to the Purchasers terminating the Purchase Agreement (the Termination

Letter). On December 21, 2015, Fleming responded, stating that Covington refused to accept the termination and claiming that Covington (finally) had the funding in place to complete the purchase.

[8] On January 20, 2016, the Purchasers filed a complaint against the Sellers, asking the trial court to order the Sellers to specifically perform the terms and conditions of the Purchase Agreement and alleging breach of contract, conversion, and tortious interference with a contractual relationship. The Sellers filed their answer and counterclaim on February 18, 2016, asking the trial court to interplead Quarterspot and rescind or reform the Quarterspot loan documents and raising claims of breach of contract, fraud, and a violation of Indiana's Corrupt Business Influence Act against the Purchasers.[2]

[9] A bench trial took place from August 6 through 8, 2018. On November 7, 2018, the trial court ruled in favor of the Sellers, finding and concluding, in relevant part, as follows:

> 7. During cross-examination, the Court found Covington to be unresponsive toward several leading questions about

---

[2] The Sellers also filed a third-party complaint against Morgan-Dade, Fleming, and Fleming's law firm, alleging claims of fraud, fraudulent inducement, conspiracy to commit fraud, and violation of the Corrupt Business Influence Act. Morgan-Dade, Fleming, and Fleming's firm each filed counterclaims against the Sellers for abuse of process. The trial court granted summary judgment in favor of Fleming and her firm on all the Sellers' claims and in favor of Morgan-Dade on all the Sellers' claims except for claims alleging that Covington was acting as her agent in the transaction.

Additionally, Quarterspot asserted a cross-claim against Covington. This claim was severed and stayed pending the outcome of this case.

specific, relevant aspects of his financial experience and general aspects of his business.

\*\*\*

22. An addendum to the Purchase Agreement that extended the Funding Closing to December 11 was tendered to the Court as evidence. It was dated December 8, 2015 and was [signed] only by Covington. The tendered copy did no[t] include any of the signatures of the sellers.

\*\*\*

30. The evidence at trial concerning the additional "loans" which Covington claims were approved to fund the Downpayment were all secured by the exact same assets— all assets of Studio 2000. In that application he misstated his ownership, stating that he [had] owned Studio 2000 for one year.

\*\*\*

IV. Conclusions of Law

\*\*\*

11. Upon a review of the evidence, the Court finds that the Closing as outlined in the Purchase Agreement never occurred because Covington did not tender the Closing funds in the proper timeframe to execute the Agreement.

\*\*\*

16. By failing to tender the $240,000 payment by December 4th, . . . Covington and Immense [] failed to abide [by] an essential term of the agreement.

*** 

20. Until [the Purchasers] had tendered the $240,000, the Purchase Agreement could not be considered executed because Covington had not provided consideration for the purchase.

*** 

22. Even if the Purchase Agreement were to have been fully executed by the signing of the documents on December 2nd with the promise to pay as consideration, Covington would be in breach . . . because he did not tender the $240,000 by December 4 . . . . As the party who first materially breaches a contract, [the Purchasers] are not permitted to then use other provisions of the contract as a shield against remedy, especially as [the Purchasers] have never satisfied the first condition of prompt payment.

*** 

26. Oral conversations without additional consideration . . . are not sufficient to alter material terms of a written contract. . . .

27. . . . The $92,300 [payment] from Covington does not constitute additional consideration because Covington was already obligated to make that payment.

28. Finally, [the Purchasers] argue that they were ready to make the payment but the Sellers have frustrated his attempts to access funds. . . . The testimony on this matter showed, however, that Covington never explained to the Sellers where he was receiving his financing and that he would need them to permit "view-only" access to Studio 2000 accounts as a condition of receiving the loan amounts. . . . [The Purchasers'] late-stage push to blame Sellers for not being able to acquire financing well-after [sic] the original Closing date is unconvincing. . . .

\*\*\*

30. The Court finds that the Closing for the Purchase Agreement never took place, and no contract between the [Purchasers] and the Sellers was ever[] fully executed. The Court finds in favor of [the Sellers] on [the Purchasers'] Count I: Breach of Contract and in favor of [the Sellers] on their Counterclaim III: Breach of Contract.

Appealed Order p. 7-17.[3] The Purchasers now appeal.[4]

---

[3] The trial court also found in favor of the Sellers on the Purchasers' claims for conversion and tortious interference with a contractual relationship; and on the Sellers' third-party complaint against QuarterSpot for rescission, though certain issues remained to be determined on that claim, so the judgment was not final. The trial court ruled against the Sellers on their fraud-related claims and on their claims under the Corrupt Business Influence Act. The trial court ruled in favor of the Sellers on Morgan-Dade's and Fleming's counterclaims for abuse of process. None of these portions of the order are at issue in this appeal.

[4] The appealed order was initially not a final judgment because there were issues yet to be determined regarding the rescission claim. At the Sellers' request, the trial court entered final judgment on the rescission claim on April 9, 2019. The Purchasers then filed a notice of appeal.

# Discussion and Decision

[10] Here, the trial court's judgment included findings and conclusions pursuant to Indiana Trial Rule 52(A). We will not set aside the findings or judgment unless clearly erroneous, and we give due regard to the trial court's ability to assess the credibility of witnesses. *E.g.*, *WindGate Props., LLC v. Sanders*, 93 N.E.3d 809, 813 (Ind. Ct. App. 2018). When reviewing the judgment, we first consider whether the evidence supports the factual findings and then consider whether the findings support the judgment. *Id.* Although we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We also note that the Purchasers are appealing from a negative judgment, which we may reverse only if the judgment is contrary to law. *RCM Phoenix Partners, LLC v. 2007 E. Meadows, LP*, 118 N.E.3d 756, 760 (Ind. Ct. App. 2019).

[11] The Purchasers argue that the trial court erroneously (1) found that the Purchase Agreement was ambiguous, (2) determined the parties' intent, (3) concluded that the Purchase Agreement was not fully executed, and (4) in the alternative, concluded that even if the contract was fully executed, the Purchasers breached it and are not entitled to enforce it against the Sellers.

[12] We can cut quickly through most of these arguments. We will assume solely for argument's sake that the Purchase Agreement was fully executed and unambiguous. By its plain terms, the transaction would be funded, including payment of the $240,000 Down Payment, "on or before 5:00PM Eastern Standard Time, Friday, December 4, 2015[.]" Appellants' App. Vol. II p. 83.

It is undisputed that this payment was not made by December 4, 2015. At that point, the Purchasers had breached the contract. *See Black's Law Dictionary* 7th ed. 182 (1999) (defining "breach of contract" as a "[v]iolation of a contractual obligation . . . by failing to perform one's own promise").

[13] The Purchasers spend much time in their brief arguing that their failure to make a timely Down Payment does not constitute an "Event of Default" as defined by the Purchase Agreement. Specifically, they note that they would have committed an "Event of Default" with respect to the Down Payment only if the Sellers had provided them written notice of their lack of compliance and they did not make the payment within fifteen days of the notice. Appellants' App. Vol. II p. 87-88. Initially, we note that they did not need notice that they had failed to make a timely payment, as they were more than aware of their own conduct. Moreover, the fact that the Sellers did not give the Purchasers fifteen days to cure the breach does not change the fact that the breach occurred to begin with.

[14] The Purchasers insist that the Sellers committed at least two breaches of the Purchase Agreement: first, by failing to give the Purchasers fifteen days to cure their breach; and second, by terminating the contract, which was not a remedy provided by the Purchase Agreement for an event of default. As noted by the trial court, it is well established that when one party to a contract commits the first material breach of that contract, it cannot seek to enforce the provisions of the contract against the other party if that other party breaches the contract at a later date. *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 917 (Ind. Ct. App.

2011). Because the Purchasers were clearly the first breaching party, the trial court correctly concluded that they were not entitled to enforce the provisions of the Purchase Agreement against the Sellers.

[15] The Purchasers also argue, essentially, that the trial court should have ordered specific performance of the Purchase Agreement. The grant of specific performance directs the performance of a contract according to, or substantially in accordance with, the precise terms agreed upon. *Kesler v. Marshall*, 792 N.E.2d 893, 896 (Ind. Ct. App. 2003). Specific performance is an equitable remedy, and the power of a court to compel specific performance is an extraordinary power that is not available as a matter of right. *Id.* Generally, our courts will not exercise equitable powers when an adequate remedy at law exists. *Id.* at 897.

[16] Here, by ruling in favor of the Sellers, the trial court ensured that the parties were put back in the respective positions they held before entering into the Purchase Agreement.[5] That is an adequate remedy at law. Moreover, we note that because the Purchasers were the first breaching party, we would be hard pressed to find that equity lies in their favor. Consequently, we find that the trial court did not err by ordering rescission and declining to order specific performance of the Purchase Agreement. *See Van Bibber Homes Sales v. Marlow*, 778 N.E.2d 852, 857-58 (Ind. Ct. App. 2002) (noting that rescission is a proper

---

[5] At some point, the Sellers returned to the Purchasers the $92,730 partial payment they had made on December 7, 2015.

remedy if a breach of the contract is a material one that goes to the heart of the contract).[6]

[17] The judgment of the trial court is affirmed.

Riley, J., and Brown, J., concur.

---

[6] We have little difficulty concluding that the purchasing party's failure to make a timely down payment is a material breach that goes to the heart of the contract.