

FILED

Oct 10 2017, 9:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

J. Christopher Janak
Bradley M. Dick
Paul D. Vink
Bose McKinney & Evans LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Mark J. Crandley
Bart A. Karwath
Nicholas K. Kile
Barnes & Thornburg, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Watson Water Company, Inc., <br><br> *Appellant-Defendant,* <br><br> v. <br><br> Indiana-American Water Company, Inc., <br><br> *Appellee-Plaintiff.* | October 10, 2017 <br><br> Court of Appeals Case No. 10A01-1607-CC-1542 <br><br> Appeal from the Clark Circuit Court. <br> The Honorable Andrew Adams, Judge. <br> The Honorable William A. Dawkins, Jr., Magistrate. <br> Cause No. 10C01-1402-CC-272 |

**Shepard, Senior Judge**

[1] Watson Water Company, Inc., and Indiana-American Water Company, Inc., are water utility companies serving customers in Clark County. Watson and IAWC executed an agreement in 1997, later amended in 2003, for the construction of a water main, and then, additionally, for the purchase of a certain volume of water. When Watson stopped performing under the terms of

the contract, IAWC sued Watson for breach and for failure to properly exercise a right-of-first-refusal clause in the contract. Watson counterclaimed, arguing that it was due a refund of payments made to IAWC beyond the cost of construction of the water main.

[2] After a two-day bench trial, the court issued findings and conclusions, holding Watson liable under the contract and issuing declaratory relief. It concluded that the agreement should remain in place and that Watson was obligated to purchase water from IAWC under the terms of the contract. Watson now appeals.

## Issues

[3] The parties raise numerous issues, which we consolidate and restate as follows:

    I.    Whether the findings and conclusions support a judgment against Watson for breach of contract;

    II.    Whether the prior-breach doctrine applies and whether the trial court correctly interpreted the right-of-first-refusal clause; and

    III.    Whether the Uniform Commercial Code applies to this contract.

## Facts and Procedural History

[4] On April 28, 1997, Watson and IAWC executed a water supply agreement. Appellee's App. Vol. II, pp. 3-7. IAWC agreed to provide to Watson during the term of the contract, or any renewal or extension periods, "potable water in such quantity as may be required by [Watson]." *Id.* at 3. IAWC also agreed to provide all of Watson's "future water supply requirements above and beyond

the capacity of its present well fields." *Id.* at 4. The term of the agreement was for forty years, or until 2037, with automatic ten-year renewals, unless notice was provided within a time set forth by contract. *Id.* at 6. Watson agreed to pay IAWC for all water used, and IAWC agreed to submit monthly bills for water delivered. *Id.* at 5. The agreement set forth when payment was due and made provisions for additional fees if the bills became delinquent. *Id.*

[5] A right-of-first-refusal clause was included and reads as follows:

> In the event [Watson] determines either to sell its entire water system or any part thereof or to arrange for the operation of part or all of the system by a third party under contract, or contemplates a new or revised water purchase agreement, [Watson] agrees that [IAWC] shall have a right of first refusal to purchase, or provide contract operations, or to sell water to [Watson] on the same terms and conditions offered by any third party. [IAWC] shall have *thirty (30) days from the receipt of notice from [Watson]* to exercise its refusal right and agree to purchase or to provide contract operations pursuant to such terms and conditions. If [IAWC] fails to exercise its refusal right, then such *refusal right will terminate*. For purposes of this paragraph, a transaction with a third party excludes a reorganization or change in the type of Corporation or Company through which the Corporation or Company, which is to be reorganized, remains in effective control of the reorganized entity.

*Id.* at 6 (emphasis added).

[6] In late 2003, Watson and IAWC executed an amendment, which explicitly stated it "shall amend the Water Supply Agreement executed between the same parties effective April 28, 1997 (the "Agreement")." *Id.* at 9. As a joint competitive matter, the parties agreed to allow Watson to purchase water

temporarily from Water One, Inc., to serve the Quarry Bluff Subdivision in Clark County. IAWC did so to allow it "to plan, construct, and make operational a new water main to serve the Quarry Bluff Subdivision in Clark County." *Id.* IAWC was to make all reasonable efforts to have the main operational within one year of the amendment's execution. Watson agreed to perform certain other tasks as respects that joint venture, but these are not points of contention in this appeal.

[7] Once the main was operational, Watson agreed to purchase from IAWC a minimum annual volume of water of 77,300,000 at the tariff rate established by the Indiana Utility Regulatory Commission. The amendment explained that the parties arrived at that volume based on the assumption that IAWC would have made a capital investment of $600,000. The parties agreed that if the actual cost varied from the assumed cost, the minimum purchase volume would be adjusted. In 2007, the minimum volume was increased to 108,300,000 gallons per year because IAWC's actual capital investment was $921,214.

[8] The parties also set forth the following addition to the 1997 Agreement's right-of-first-refusal clause:

> [If] Paragraph #14 of the Agreement is invoked, and [IAWC] either fails to exercise its refusal rights and/or does not become the purchaser, contract operations provider, or seller of water to [Watson] as provided in Paragraph #14, [Watson] agrees to immediately pay to [IAWC] its actual cost to plan and construct the main and make it operational.

*Id.* at 10. The amendment explicitly stated, "All other terms and conditions of the Agreement between the parties shall remain in full force and effect." *Id.*[1]

[9] In 2005, the water main extension became operational. As respects the minimum volume purchase requirement, the parties' course of performance was inconsistent. In 2006 and 2009, Watson did not take and pay for the minimum volume, and IAWC did not bill full price for the difference. In 2007 and 2008, Watson took the minimum volume. In 2010 and 2011, Watson did not take the minimum volume, IAWC billed for the difference, and Watson paid the difference. Beginning in 2012 to 2015, Watson did not take the minimum volume and IAWC billed for the difference, but Watson refused to pay full price for the difference.[2]

[10] On January 17, 2012, Watson and River Ridge Development Authority executed a reciprocal water supply agreement. Appellant's App. Vol. II, pp. 84-86. Put simply, both Watson and RRDA were willing, in "cases of emergency from time to time to buy water" and sell it to each other on an "'as needed' basis." *Id.* at 84. On October 26, 2012, the parties executed an addendum to

---

[1] Watson, by counsel, attempted to limit the duration of the overall agreement, but the proposals involving terms of ten years and fifteen years were each rejected. The parties, represented by counsel, in an arms-length transaction, signed the amendment, incorporating the original forty-year duration of the contract.

[2] In 2009, there was a problem with the meter, and IAWC did not charge Watson for the minimum volume. Tr. Vol. II, p. 44.

the reciprocal water supply agreement to document the cost of the construction and installation of a connection point. Appellant's Br. at 14.

[11] About July 23, 2013, Watson and RRDA executed a first amendment to the reciprocal water supply agreement. Tr. Vol. XII. The amendment resolved a conflict in the differing rates each party charged for water such that when water was needed, the lowest rate charged by either party at that time, after documentation was exchanged, would reflect the rate billed.

[12] IAWC sued Watson on February 27, 2014. As amended, the complaint alleged breach of contract by Watson's failure to purchase the required annual minimum amount of water from IAWC. IAWC sought damages for Watson's breach and a declaratory judgment that the contract remained in force. Watson counterclaimed arguing that it should be repaid all money above the cost of the construction of the main. IAWC alleged that Watson's outstanding balance by the end of 2015, excluding late charges and attorneys' fees was $813,271.66. Watson, on the other hand, alleged under its theory that it was only required to pay for construction of the water main, and that it had overpaid IAWC $376,592.87.

[13] Sometime in 2014,[3] after IAWC had filed suit, RRDA and Watson executed a second amendment to their reciprocal water supply agreement. Appellee's App. Vol. II, pp. 20-24. The parties agreed as follows:

> **RRDA as Exclusive Provider of Watson Water's Future Needs.** Subject to the terms of the Agreement and any rulings, orders, and/or decisions by administrative agencies or courts with legal jurisdiction (including, but not limited to, any settlement reached by Watson Water in its pending litigation with Indiana-American Water Co., Inc., Cause No. 10C01-1402-CC-272), which may overrule, invalidate, supplement, or otherwise modify the Agreement, including this Second Amendment, Watson Water agrees that RRDA shall be the exclusive source of Watson Water's future water purchases when it is unable to internally provide for the water needs of its customers. In the event Watson Water contemplates a new or revised water supply agreement, Watson Water agrees that RRDA shall have a right of first refusal to sell water to Watson Water on the same terms and conditions offered by any third party. If RRDA fails to exercise its refusal right, then the Agreement shall terminate.

*Id.* at 22.

[14] Counsel for Watson sent a letter to counsel for IAWC dated August 14, 2014, discussing the possibility of mediation of the pending legal action and confirming certain details of conversations. Tr. Vol. XII. Watson's counsel contended that he was aware counsel for IAWC had been supplied with a copy

---

[3] The representative of RRDA and the Indiana Department of Natural Resources indicated that their signatures were dated December 16, 2014. The representative for Watson has dated his signature as March 21, 2014.

of the second amendment to the Watson/RRDA agreement. *Id.* Counsel also claimed to have confirmed that IAWC received the documents from RRDA on May 5, 2014, pursuant to a documents production request. *Id.* Watson asserted that since IAWC had not exercised its right of first refusal within thirty days of receipt of the documents, Watson concluded that IAWC did not wish to exercise its right. *Id.* Watson then noted that if IAWC believed that it still held a right of first refusal, the matter would need to be addressed at a future meeting. *Id.*

[15]    Watson and IAWC submitted the following stipulations for trial:

> 1.  The total amount of money Watson has paid to IAWC from January 2006 to the present under the Amendment to the Water Supply Agreement is $1,297,806.87.
>
> 2.  As of January 6, 2016, the total amount that IAWC has billed Watson, and remains unpaid, is $813,271.66. A late payment charge of $24,398.36 is also sought by IAWC.
>
> 3.  Watson claims that it was entitled to invoke, and that it did properly invoke, a right of first refusal clause, and that because IAWC did not exercise its right, the Water Supply Agreement and Amendment terminated as of September 13, 2014. IAWC disputes these contentions on numerous bases. As of September 13, 2014, the total amount that: (1) IAWC billed Watson prior to 2014 that remained unpaid; and (2) the amount IAWC would have billed for 2014 through September 13, 2014 was $438,801.04. IAWC claims that an additional $921,214.00 would also be owed. Watson disputes that this additional amount would also be owed to IAWC by Watson.
>
> 4.  Watson is not contending that it cannot take the 108,300,000 gallon annual minimum requirement from IAWC.

5. Watson is not contending that IAWC forced water into Watson's system and is not contending that IAWC caused Watson's tank to flood and/or caused any damages to Watson's property.

Appellant's App. Vol. II, pp. 179-80.

[16] After the conclusion of the two-day bench trial in March 2016, the court entered findings and conclusions, issuing an order awarding IAWC the following: (1) $813,271.66 in unpaid amounts under the contract; (2) late charges of $24,398.36; (3) a declaratory judgment that the 1997 agreement and the 2003 amendment remain in place and continue through the remainder of the forty-year term up to and including 2037; (4) a declaratory judgment that Watson is required to continue purchasing an annual minimum water volume of 108,300,000 for the remainder of the duration of the contract (through 2037); and (5) the trial court's agreement to entertain a request for attorney's fees and costs assessed against Watson.

# Discussion and Decision

## Standard of Review

[17] Prior to trial, Watson filed a motion requesting findings under Trial Rule 52(A). Upon review, we shall not set aside such findings or judgment unless clearly erroneous. *In re Marriage of Gertiser*, 45 N.E.3d 363 (Ind. 2015). Appellate courts will give due regard to the trial court's opportunity to judge the credibility of the witnesses. *Id.* We determine whether the evidence supports the findings, and then whether the findings support the judgment, and do so

without reweighing the evidence or reassessing the credibility of witnesses. *Id.* The trial court's findings are controlling unless the record contains no facts supporting them directly or by inference. *Id.* Our review of legal conclusions is *de novo*. *Id.*

# I. Breach of Contract

[18] IAWC's complaint alleges, in part, breach of contract. A breach of contract action involves the elements of the existence of a contract, the defendant's breach of the contract, and resulting damages to the non-breaching party. *Murat Temple Ass'n, Inc. v. Live Nation Worldwide, Inc.*, 953 N.E.2d 1125 (Ind. Ct. App. 2011), *trans. denied.* At the heart of the various challenges presented in this appeal are the parties' arguments about the interpretation of the terms of the agreement and the amendment, which form their contract.

[19] Interpretation of a contract is a question of law which is reviewed *de novo*. *Dunn v. Meridian Mut. Ins. Co.*, 836 N.E.2d 249 (Ind. 2005). When a contract's terms are clear and unambiguous, courts must give those terms their clear and ordinary meaning. *Id.* Instead of placing provisions of a contract's terms in conflict, courts should interpret those provisions to harmonize them. *Id.*

[20] The explicit terms of the 1997 agreement and the 2003 amendment reflect that the amendment "shall amend the Water Supply Agreement executed between the same parties effective April 28, 1997 (the "Agreement")", and that "All other terms and conditions of the Agreement between the parties shall remain in full force and effect." Appellee's App. Vol. II, pp. 9-10. Thus, the court's

finding that "the Amended Agreement is a single, enforceable contract between the parties", is supported by the record. Appellant's App. Vol. II, p. 24.

[21] Also explicit in the terms of the contract is the provision that Watson purchase a certain volume of water. Although the volume of water required was initially based on an assumed capital investment by IAWC of $600,000, the parties explicitly agreed to a future modification of the volume based upon IAWC's actual capital investment. The volume was adjusted to 108,300,000 gallons per year at IAWC's tariff rate for the duration of the contract.

[22] Although the record reveals that Watson attempted to negotiate a limitation on the duration of the minimum volume requirement, the negotiations failed and the parties signed the amendment. The trial court's finding that the purchase requirement of the minimum volume of water lasted for the duration of the contract, i.e., until 2037, is supported by the record.

[23] Next, we turn to the issue of Watson's breach. Watson did not purchase the minimum volume for 2012, 2013, 2014, and 2015. One of the stipulations in advance of trial was that Watson did not contend that it could not take the 108,300,000 gallon annual minimum requirement from IAWC. Consequently, the court's finding of breach by Watson is supported by the record.

[24] As for damages, exclusive of late fees and attorney fees, as of January 6, 2016, the total amount that IAWC has billed Watson, and remains unpaid, is $813,271.66, an amount stipulated to by the parties prior to trial.

Therefore, the trial court's findings that there was a contract, that Watson breached the contract, and that IAWC was damaged by the breach, are supported by the evidence. IAWC has met its burden of proving Watson's breach of contract. *See Indiana-American Water Co., Inc. v. Town of Seelyville*, 698 N.E.2d 1255 (Ind. Ct. App. 1998).

## II. Prior Breach Doctrine and Right of First Refusal

Watson contends that IAWC is foreclosed from enforcing the contract and seeking damages for a breach thereof under the prior breach doctrine and alleges the trial court is allowing IAWC to selectively enforce only those terms of the contract it chooses. Watson argues that IAWC is being allowed to enforce the minimum purchase agreement provision while disavowing the right-of-first-refusal clause.

"When one party to a contract commits the first material breach of that contract, it cannot seek to enforce the provisions of the contract against the other party if that other party breaches the contract at a later date." *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 917 (Ind. Ct. App. 2011). The issue whether a party has materially breached an agreement is a question of fact, dependent on a variety of factors. *Id.* at 917-18.

Watson has cited to *Land Dev. Ltd v. Primrose Mgmt. L.L.C.*, 952 N.E.2d 563, 571 (Ohio Ct. App. 2011), for the proposition that the prior breach doctrine is applicable only when the non-breaching party treats the contract as terminated not continuing. A fair reading of the case, however, suggests that the Ohio

court held that the non-breaching party may select whether to (1) terminate the contract or (2) continue on with the contract, so long as the non-breaching party also fulfills its obligations under the contract to avoid an inequitable result.

[29] Watson claims that IAWC later breached the agreement by failing to acknowledge what Watson characterizes as its valid exercise of the right-of-first-refusal clause.

[30] We have previously quoted the original language and amendment comprising the right-of-first-refusal clause. Suffice it to say, to the extent Watson was attempting to do so, we agree with the trial court that Watson did not properly avail itself of the clause.

[31] First, Watson negotiated and executed an initial reciprocal agreement with RRDA for the purchase and sale of water as needed. Watson did not provide IAWC with the opportunity to match the terms of that agreement or refuse to exercise that right. Even though the clause requires notice from Watson to IAWC of any contemplated agreement with a third party, none was given. IAWC became aware of the terms of Watson's original and amended agreements with RRDA only by way of RRDA's response to a request for production of documents after litigation had commenced. We conclude that the thirty-day period for IAWC to exercise its option was never triggered.

[32] The agreement as amended between RRDA and Watson was contingent on the outcome of the litigation between Watson and IAWC. Watson indicated that it sought to eliminate its obligation to buy water exclusively from IAWC. The

trial court's finding that the agreement between RRDA and Watson was a sham in order to avoid the contract is supported by the record.

[33] IAWC sued for damages for Watson's breach and declaratory relief that the contract remained in force. This position follows the terms of the contract. The trial court rightly found so.

[34] The trial court correctly concluded that even if the right-of-first-refusal clause was triggered, the only provision that would terminate was the clause, not the entire contract. The clause explicitly states that the right of refusal terminates. Appellee's App. Vol. II, p. 6. Notably, the purported agreement between RRDA and Watson provides that upon the failure to exercise the right of first refusal, the *agreement* terminates. *Id*. at 22 (emphasis added). The trial court did not err in its interpretation of the clause.

## III. Applicability of the UCC and Damages Calculation

[35] Next, Watson contends that it is absolved from its breach of contract because the UCC applies to an agreement involving the sale of goods. Watson cites to a bankruptcy case applying Texas law, *In re Sage Enterprises, Inc.*, 421 B.R. 477 (B.R. N.D. Ill. 2009), for several propositions under the UCC. First, however, we must determine the nature of this contract and whether it was for the sale of goods.

[36] Indiana Code section 26-1-2-306(1) is the codification of the UCC's provision regarding output or requirements contracts. *Indiana-American Water Co., Inc.*, 698 N.E.2d 1255. That section reads as follows:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

[37] "Generally, the buyer in a requirements contract governed by UCC § 2-306(1) is required merely to exercise good faith in determining his requirements and the seller assumes the risk of all good faith variations in the buyer's requirements even to the extent of a determination to liquidate or discontinue the business." *Id.* at 1261. "A requirements contract is one in which the purchaser agrees to buy all of its needs of a specified material exclusively from a particular supplier, and the supplier agrees, in turn, to fill all of the purchaser's needs during the period of the contract." *Id.* at 1259. The good faith requirement imposed under the UCC and Indiana Code section 26-1-2-306, prevents requirements contracts from being illusory or too indefinite to be enforced. *Id.* at 1260.

[38] From time-to-time, there will be variations in the buyer's requirements. "The essential ingredient of the buyer's good faith under such circumstances is that he not merely have had second thoughts about the terms of the contract and want to get out of it." Id. at 1261. On the other hand, if a buyer has a legitimate business reason for eliminating its requirements, instead of a desire to simply avoid the contract, then the buyer is acting in good faith. Id.

[39] Here, Watson stipulated that it was not contending that it cannot take the 108,300,000 gallon annual minimum requirement from IAWC. The inference

to be drawn from the evidence is that Watson attempted to avoid its contract with IAWC. Additionally, the record reflects that one of the reasons Watson executed the agreement with RRDA and sought to modify it in both capacity and duration was to "eliminate an existing water supply agreement they have with Indiana-American Water Company." Appellee's App. Vol. II, p. 19.

[40] Under a definitional provision, Indiana Code subsections 26-1-2-105(1) and (2) (1995), goods are defined as follows:

> (1) "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale, other than the money in which the price is to be paid, investment securities (IC 26-1-8.1), and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (IC 26-1-2-107).

> (2) Goods must be both existing and identified before any interest in them can pass. Goods which are not both existing and identified are "future" goods. A purported present sale of future goods or of any interest therein operates as a contract to sell.

[41] Watson's argument here is another attack on the duration of the contract, this time under the UCC, and would have an impact on the damages calculation. The dispositive provision of Indiana's codification of the UCC, Indiana Code section 26-1-2-309 (1986), pertaining to the absence of specific time provisions and notices of termination, provides as follows:

> (1) The time for shipment or delivery or any other action under a contract, if not provided in IC 26-1-2 or agreed upon, shall be a reasonable time.

(2) Where the contract provides for successive performances but is indefinite in duration, it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party.

(3) Termination of a contract by one (1) party, except on the happening of an agreed event, requires that reasonable notification be received by the other party, and an agreement dispensing with notification is invalid if its operation would be unconscionable.

[42] The parties agreed to a duration of the contract terms, which remained in place after negotiations for a shorter term failed. We agree with the trial court that Watson's argument for a "reasonable time" evaluation under the UCC fails.

[43] Next, regarding damages, Watson argues that the trial court erred by concluding that IAWC may recover under the parties' contract only to the extent of the UCC, because the UCC allows recovery under Indiana Code section 26-1-2-708 (1986).

[44] That section provides as follows:

(1) Subject to subsection (2) and to the provisions of IC 26-1-2-723 with respect to proof of market price, the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in IC 26-1-2-710, but less expenses saved in consequence of the buyer's breach.

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done, then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in IC 26-1-2-710, due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

Again, the parties agreed to a minimum purchase volume over the course of forty years. IAWC's rates were regulated by the IURC, a fact that was acknowledged by the parties. Thus, the parties were aware that IAWC could not have resold the water for a profit. Further, much like the duration provision, the parties explicitly agreed to a minimum purchase of a volume of water over the course of forty years. The volume requirement was based on the capital investment by IAWC, but was not limited to recoupment of that investment.

[45] We find no error in the trial court's holding that Watson was bound by the terms of the agreement with which it agreed at arm's length with IAWC, acknowledging the cost of the production of water in addition to the capital expenditure.

# Conclusion

[46] In light of the foregoing, we affirm the trial court's findings, conclusions, and judgment.

[47] Affirmed.

Kirsch, J., and Pyle, J., concur.